IN THE MATTER OF: FRANKLIN S. KINCHELOE, JR., M.D.'s APPLI-
CATION FOR REVIEW OF ORDER OF BOARD OF MEDICAL EX-
AMINERS OF THE STATE OF NORTH CAROLINA.

(Filed 29 November, 1967.)

**1. Appeal and Error § 48;   Physicians and Surgeons § 1—**

Where a physician himself injects into the hearing of charges for the
revocation of his license previous misconduct which had resulted in the
suspension of his license, he may not object that evidence relating to
the prior suspension was introduced in evidence, even though such evi-
dence be incompetent, since error in the admission of evidence is cured
when evidence of substantially the same import is theretofore admitted
without objection. Further, the admission of such evidence could not be
prejudicial in view of the record disclosing that the members of the
Board already had knowledge of the previous proceedings.

**2. Evidence § 58;   Physicians and Surgeons § 1—**

Where a respondent, in a proceeding to determine whether his license
as a physician should be revoked for unprofessional conduct, testifies in
his own behalf, it is competent to cross-examine him as to prior miscon-
duct as bearing upon his credibility.

**3. Physicians and Surgeons § 1—**

An acquittal of a physician on a charge of rape does not bar a sub-
sequent proceeding by the Board of Medical Examiners to determine
whether the physician's license should be revoked for unprofessional con-
duct in regard to the same incident upon which the charge of rape was
founded, the nature and scope of the two proceedings being entirely
disparate.

**4. Same;   Constitutional Law § 32—**

It is not required that respondent be represented by counsel in a pro-
ceeding by the Board of Medical Examiners to determine whether his
license should be revoked for unethical conduct. In the present case the
physician waived counsel, saying he could not afford to employ counsel,
but it appeared that his office had been so filled with patients that he
had to decide whom he would see first, and it further appeared that he
was represented by able counsel employed by him in the court pro-
ceedings without any showing of change of financial condition.

**5. Administrative Law § 5;   Physicians and Surgeons § 1—**

The record in the present case *held* not to disclose that the Board of
Medical Examiners permitted any incompetent prejudicial evidence in
its hearing to determine whether respondent physician's license should
be revoked, and it was error for the Superior Court to order the cause
remanded to the Board for another hearing on the ground that the
Board had considered prejudicial incompetent evidence in reaching its
findings. G.S. 90-14.6.

**6. Physicians and Surgeons § 1—**

It is proper for a medical board to revoke the license of a physician
or surgeon who is a deviate or who is prone to lascivious conduct in re-
gard to persons of the opposite sex, since in either case he should not be

allowed to practice a profession which affords him the frequent opportunity, if not the temptation, to accede to his deviations or lasciviousness.

**7. Physicians and Surgeons § 1—    Evidence held sufficient to support order of Board revoking respondent's license for unprofessional conduct.**

Evidence tending to show that respondent physician examined a young woman who had been brought to his office by her mother, took the young woman into another room where they were alone for 45 minutes or more, that he had her strip nude and gave her an injection which rendered her unconscious, that when she reappeared in the outer office she was dizzy and had to hold on to the wall, that after the occasion there was a laceration at the entrance to her vagina and her private parts were sore, etc., *held* amply sufficient to sustain the Board's findings of fact consonant with such evidence and to warrant the Board's order revoking the physician's license for unprofessional and dishonorable conduct.

APPEAL by Board of Medical Examiners of North Carolina and Licensee Franklin S. Kincheloe, Jr., M.D., from *Thornburg, S.J.,* September 1967 Session, WAKE County Superior Court.

On 1 November 1966 Dr. Kincheloe was served with notice from the Board of Medical Examiners of the State of North Carolina that certain charges and accusations were made against him and that a hearing on them would be held on 6 January 1967. The charges related to his alleged mistreatment of Deborah Edwards (Stanley), the respondent's patient, on 17 August 1966. In detail, they alleged that he caused Miss Edwards to remove all of her clothing without any medical reason or necessity, examined verious parts of her nude body while no other person was present, administered a hypodermic which rendered her unconscious; and while in that condition he acted in an unprofessional capacity and engaged in sexual intercourse with her. The notice also stated that the respondent's conduct was unprofessional and dishonorable and constituted grounds for the revocation of his license to practice medicine.

As a result of the 6 January hearing, the Board found Dr. Kincheloe guilty of unprofessional and dishonorable conduct and ordered that his license to practice medicine be revoked.

The respondent appealed to the Superior Court of Wake County, and thereafter the Court stayed the revocation of his license pending a hearing and remanded the cause to the Board of Medical Examiners for further findings and order. After several interlocutory motions and orders, the cause came again to the Superior Court upon the respondent's appeal and was heard before Hon. Lacy H. Thornburg, Judge Presiding in Wake County on 20 September 1967.

The stenographic record of the evidence presented before the Board was included in the respondent's case on appeal and was

given consideration by the Court. The respondent was also permitted to testify orally before the Court.

Summarized, except where quoted, the evidence against the respondent before the Board of Medical Examiners tended to show that on 16 August 1966 Mrs. Myrtle Edwards took her sixteen-year-old daughter Deborah Jean Edwards to Dr. Kincheloe's office for an examination and attention. After an hour or so, he took Deborah and her mother into his private office where the mother told the doctor that Deborah had been feeling bad, that she thought her kidneys were bad and that she wanted the doctor to check them. Deborah had been struck by the mirror of a truck the day before and had been suffering from a headache since then.

Dr. Kincheloe took Deborah into another room, leaving her mother in his office. He kept her there from about 3:30 p.m. until after 5:00 p.m. When Deborah came out she was holding onto the wall, steadying herself, staggering and was dizzy. Mrs. Edwards and Deborah then went to the home of another daughter, and later Deborah told two older sisters what had occurred while she was with Dr. Kincheloe. The sisters told the mother, and the next morning Deborah was examined by Dr. Leonard S. Woodall who testified that he made a pelvic examination to see if Deborah had had intercourse; that he found sperm and a laceration of the hymenal, and that in his opinion she had had intercourse.

Deborah testified that she had been hit by the mirror of a truck and received a blow on her right temple; that she had some bad headaches that night and the next day, and also that she had been in bed sick for about a week and "mother thought it was my kidneys." Upon being admitted to Dr. Kincheloe's private office, Mrs. Edwards told him that she wanted him to examine Deborah's head because the truck had hit her and to check her kidneys. The child was then taken to another room, and Dr. Kincheloe asked her to go into the bathroom and give him a specimen of her urine, which she did. The doctor told her to put it on the table, and it was still in the same place when she left the room over an hour later.

She then testified as to what further occurred, except for a period of unconsciousness caused by the injection of some drug in her arm. No good purpose would be served by relating the details of the hour-long treatment during which no nurse or other person was present.

She said she was required to completely disrobe, and after a more than complete examination was given an injection that rendered her unconscious. Her evidence offered a substantial base for the findings of the Board which were affirmed by the Court.

She was dizzy and had to hold onto the wall or chair to keep

from falling as she left the office. When she got to her sister's house she told her mother that the doctor had given her a shot and she passed out and "I was real dizzy and sleepy like I could sleep for three or four days. I was scared you know when I woke up I was real sore and it hurt me when I walked . . . but I was scared to say anything about it so I didn't mention it." The next day she told her sister Virginia about it, and Virginia told another sister, Becky. About an hour later the two sisters came over to Deborah's house, "and I told her about what I thought had happened and then Becky went and told mother she thought I ought to go to the hospital and be examined. . . . I was sore in my lower private parts and it hurt me to sit down. As soon as I awoke I was hurting, and sore but I didn't say anything about it to anybody. . . . I was sore all the next day. . . . There was some bleeding from my body that night when I came home. . . . I discovered a small amount in my pants and a lot of discharge."

Deborah testified that she had not engaged in sexual intercourse before the incident in Dr. Kincheloe's office.

Mrs. Rebecca Edwards Wheeler corroborated the testimony of her young sister Deborah, saying that after the other sister Virginia told her about talking with Deborah that she then questioned Deborah, who recounted the details of the experience with Dr. Kincheloe. Her testimony fully corroborated Deborah's testimony.

Mr. Robert D. Emerson, Special Agent of the State Bureau of Investigation, said that after his department has been called into the case, he interviewed Mrs. Myrtle Edwards and Deborah Jean Edwards, and that at the time of the interviews, E. L. Norton, another agent of the S.B.I., and a lady were present. In essence, he said that the statements made to him by Mrs. Edwards and her daughter were the same as contained in her testimony before the Board. He also said that he had investigated the reputations of Mrs. Edwards and Deborah and that they were good.

When the Board began its hearing on 6 January 1967, Dr. Kincheloe was present but was not represented by counsel. Before going into the hearing, he was asked if he had counsel and replied that he did not and said he didn't feel that it was necessary. Previously, the respondent had indicated that he did not wish to remain in the room during the testimony of witnesses, and he was then given an opportunity to make a statement regarding that subject. He then said:

"Gentlemen, in brief, what I asked Mr. Anderson and Dr. Combs was to be excused from this, sitting through this story of the prosecution; I have sat through it in court and I frankly

· · do not care to hear ·it again; I assume that Bob Anderson will see to it that the story is told as it was told in court, and after you have dispersed with these witnesses, then I will be glad to give you a statement of what actually happened. During the trial we presented no defense, it was not assumed to be necessary; the prosecution presented their story and my version of what actually happened has not been told.

"DR. DAVIS: Well, if it is your preference, then we will excuse you from this part of the proceedings.

"DR. KINCHELOE: Thank you very much.

"(Dr. Kincheloe is excused.)"

During the examination of the witnesses, an attempt was made to locate Dr. Kincheloe, but he was not to be found in the building. Later he returned to the hearing room and was asked if he cared to examine any or all of the witnesses, to which he replied: "No sir, this has been done in court previously, and I am not an attorney. I don't feel qualified to cross examine the witnesses. . . . I would like simply to present my story telling you exactly what happened." He was then sworn and said:

"Gentlemen, I would like to have the privilege of telling my story without interruption if it is all right with you, and if you have any questions when I finish, feel free to ask them. Let me preface my remarks by saying that some three and a half years ago I was before this Board, at which time I was guilty of something I am quite deeply ashamed of, I was certainly in the wrong and the decision of this Board to revoke my license at that time I feel was entirely justified; I centainly bear no ill feeling against this Board. And had I been on the Board at the time myself I feel that my decision in that particular case would have been the same as yours, you had no choice but to do what you did at that time."

He then said that he was a changed man and was incapable of doing what he was charged with; that when Mrs. Edwards brought her daughter to his office she said she wanted him to give Deborah a complete examination, and he thought perhaps the mother suspected that her daughter was pregnant and assumed she wanted a pelvic examination. He testified he examined her urine while Deborah was getting undressed; that he did not watch her undress; that when he went back to the examining room "Deborah Jean was sitting on the edge of the table with the sheet pulled up over her . . . she did not wear a slip to the office that day, and so underneath she had nothing on, . . . I had her lie down and pulled out

the extension to the table . . . I did a routine examination of her chest while she was in the supine position, I had no nurse present but the door was open — the door was not locked certainly, to this office, the mother had indicated that she did not care to come back there with the daughter . . . she had free access to come in at any time and I felt that with the mother present there it was certainly not unethical to examine the girl when all the girl had to do if she wanted her mother was to ask for her and the girl certainly did not ask for her mother . . . I did not watch her undress . . . I did nothing to embarrass the girl, the entire course of the examination was routine and entirely ethical." He said he did not give her a shot in the arm which put her to sleep; that he did give her a shot of pencillin in the hip and had her roll slightly on the table, "the sheet was over her during this entire course of the examination except of course those parts that were being examined, and everything was done in a strictly doctor-patient relationship. . . . I certainly did not tell her that she was pretty, that she looked like a movie star . . . made no attempt to kiss her. . . . I gave her the shot of pencillin in her hip and I put her feet in stirrups and did a routine pelvic examination of her. I asked her at the time if I was hurting her in any way and she said no. There was no indication, I did not notice any break in the mucosa . . . She had a marital outlet, I had no difficulty in examining her. . . . [W]hen I finished doing the pelvic I turned around and went into the bathroom . . ., told Deborah Jean to get her clothes on and while I was washing the glove and the speculum . . . her mother knocked at the door . . . I opened the door, her mother came in, Deborah Jean was standing there, she was already dressed . . ."

He said he then did a hemoglobin, told the mother that he had found nothing wrong other than a mild sore throat and gave Deborah some B vitamin. He said the girl was in his office not over forty or forty-five minutes, during which time he was interrupted by at least three or four telephone calls; that he made no advances; that he was forty-five years of age and wouldn't think of doing anything like this in his office.

He also said that his lawyer had checked into Deborah's character; that she was "certainly not virginal and I have heard of other boys that she's been out with but there are three that I definitely know of that told me they had been out with her and had intercourse with her . . ."

Following his statement, several members of the Board, as well as Mr. Anderson, the attorney for the Board, asked him questions.

No new evidence was developed, and the questions were not of a harsh nature but constituted a repetition of his previous evidence. He said, "[It] was quite obvious when I put her up for a pelvic examination, that she was not virginal." He discovered no laceration and saw no indication of pregnancy. He further said that Deborah did not resent having to take her clothes off, did not ask for her mother to be present; that he closed the door because it is not good policy to examine any female patient with the door open where someone can come in unexpectedly. Mr. Anderson then said, "I will not ask you at this time about your last appearance, the Board can ask you about that . . . [Answer] Well, as I said, gentlemen, I have a deep sense of guilt about that appearance, as I told you I was in the wrong, I know I was in the wrong and I feel that what you did in that instance was completely justified, you had no other recourse than to do what you did."

In response to a question that didn't he think it was necessary to have another female present at the time of the examination, he said he wanted another female in the immediate vicinity where they can come in but did not require her to remain during the entire course of the examination; that if he had known the examination was going to involve the time it did or if he had known that she wanted a complete examination he would not have taken her back there.

The record shows that several members of the Board asked the respondent concerning his previous trial by the Board, and he repeatedly said that the Board did the right thing; that he had no criticism of it, that he would have done the same thing had he been a member of the Board and admitted that he had not been truthful in regard to the previous charge.

He was then asked about his attempted suicide following the present charge and his treatment at Dorothea Dix Hospital where he stayed for twenty days after the charge was filed against him. He replied that when he was charged with raping Deborah, his wife had said "that she was going to leave me, she was fed up with all this, that she was through with me, and I was depressed enough to think she meant it . . . I filled myself just as full of phenobarbital as I could. . . . More than a lethal dose. . . . This is the first time I've ever attempted suicide and it will certainly be the last time."

He said he had a gun in his pocket when he was taken to the State Hospital, and "I debated and couldn't decide whether to shoot myself, I decided that would be too messy."

George Eason testified for the defendant that he and several

other patients were in Dr. Kincheloe's office the day Deborah and her mother came there; that the latter were taken ahead of him; that they were "back there I don't know, forty to forty-five min-utes . . . I heard the phone ring several times . . . The girl and her mother looked well when they left the office, seemed to be all right." Upon cross examination, the witness admitted that he had served time in several places for breaking and entering, fighting, and intoxicants.

At the conclusion of the evidence before the Board, the respondent expressed the hope that his testimony had been heard with an open mind and said, "I can only re-emphasize that I am not the same person that I was at the time I was here before this Board before, and this thing that has happened to me recently I am not guilty of, any facet of it."

On 10 January 1967, by unanimous vote, the Board found and concluded "that Franklin S. Kincheloe, Jr., M.D., in connection with his treatment of Deborah Jean Edwards on August 17th, 1966, was and is guilty of unprofessional and dishonorable conduct unworthy of, and affecting, the practice of his profession, and that grounds exist for the revocation of his license to practice medicine, and ordered that the license of said Franklin S. Kincheloe, Jr., M.D. to practice medicine in the State of North Carolina be revoked."

The respondent gave notice of appeal to the Superior Court and obtained a stay of the revocation of his license. At the April 1967 Session of Wake County Superior Court, the respondent moved that the Board of Medical Examiners "be required to either abandon the charges contained in paragraph No. 1 . . . or to pass upon the same before any hearing upon this notice of appeal." The Court allowed this motion and remanded the cause "to the Board of Medical Examiners . . . for disposition of the charges contained in paragraph 1 of the Charges and Accusations as shown in the record."

On 12 June 1967, the Board reviewed the testimony, considered and discussed each of the charges and accusations and then found (1) that the respondent "in connection with his treatment of Deborah Jean Edwards as a patient directed and caused her to enter a room in the rear of his office, excluded her mother from the room, and entered the room and closed the door"; (2) that he "then directed and caused her to remove all her clothing in his presence without any medical reason or necessity"; (3) that he "examined the various parts of the nude body . . . in a room, the door or doors to which were closed, and in which no other person was present"; (4) that he "administered to [her] a drug by hypodermic injection which rendered her unconscious for an appreciable period

of time without any medical reason or necessity"; (5) that "while [she] was unconscious and insensible to her surroundings and while no other person was present and while she was unclothed, examined, observed, touched, and otherwise came in contact with her body, all without medical reason or necessity"; (6) that he "attempted to kiss [her]"; (7) that he "placed his arms around [her] while she was unclothed, without any medical cause or necessity"; (8) that he "penetrated the vaginal cavity which caused a laceration at the entrance to the vagina . . . without medical reason or necessity, and without the presence of any other person"; (9) that "by his remarks and actions in his dealings and attendance of [her], displayed a lustful, lascivious, and unprofessional attitude and demeanor, and he did take unprofessional liberties with her"; (10) that "in connection with his treatment of Deborah Jean Edwards as a patient engaged in sexual intercourse with [her]"; (11) that he "was guilty of unprofessional and dishonorable conduct unworthy of and affecting his profession and that grounds exist for the revocation of his license to practice medicine . . ."

Following these findings, the order concluded:

> "Upon motion duly made, and seconded and unanimously adopted the Board ordered that the Order of the Board of January 10th, 1967, revoking the license of Franklin S. Kincheloe, Jr., M.D. to practice medicine in the State of North Carolina be reaffirmed and reiterated, and that his license to practice medicine be revoked."

This order was signed by Jos. J. Combs, M.D., Secretary of the Board, and the following day an order was signed by James E. Davis, M.D., President of the Board, confirming the findings of the previous day and ordered revocation of the respondent's license.

The respondent filed numerous exceptions to the foregoing orders, and the matter was heard on appeal before Judge Lacy H. Thornburg, Judge Presiding in the Superior Court of Wake County, in September 1967.

At the hearing before Judge Thornburg, the respondent was permitted to make a statement in which he said that he had expected the Board to take the transcript of his trial in the Superior Court "as these witnesses had been cross examined and then I felt they would take all this information available to them in the court proceedings." He further said that he did not take a lawyer with him to the Southern Pines hearing before the Board because he could not afford the services of a lawyer and did not have any money from any source with which he could have employed an attorney; that he had never cross examined any witnesses; that he

had requested that he not be present when the witnesses testified; that he be excused from this proceeding; that their testimony had been presented in the trial and he assumed they would go by that transcript.

Upon cross examination, the respondent said that he had received notice of the charges against him in October 1966 and had read them and understood them; that he was not under any mental disability then or at the time of the Board hearing; that he knew he would be permitted to appear in person or be represented by counsel; that he was asked to stay and hear the witnesses and declined to do so. He further said that he had employed lawyers in connection with the charges against him two or three times; that he voluntarily surrendered his narcotics license in 1952; that he employed counsel in connection with the charges preferred against him by the Board in 1963; that he had counsel at that hearing and two lawyers on appeal to the Superior Court and that one of them was the attorney now representing him.

Judge Thornburg in a complete order found the essential facts and made rulings of law. In summary, he found that the Board had authority to revoke Dr. Kincheloe's license; that there was no defect in the notice to him; that his right to be represented by counsel was knowingly and intelligently waived as was the right to confront witnesses; that his trial and acquittal of criminal charges was not *res judicata* nor a bar against the proceedings before the Board; that there was sufficient competent evidence to support revocation of his license and its conclusions that he was guilty of unprofessional and dishonorable conduct. (It was from these findings and rulings that the respondent appealed.) The Court then held that he did not receive a fair and impartial hearing by the Board; "[t]hat incompetent evidence outside the scope of his notice of charges and accusations was heard and most probably considered by the Board in reaching its decision"; and that the Board did not comply with the mandatory provisions of G.S. 90-14.6. (From these findings and rulings, the Board appealed.) The Court then remanded the case for hearing *de novo* before the Board and stayed the order of revocation pending further proceedings.

Both parties filed exceptions, which are discussed in the opinion.

*Albert A. Corbett, Attorney for Franklin S. Kincheloe, Jr., M.D.*

*Smith, Leach, Anderson & Dorsett by John H. Anderson, Attorneys for The Board of Medical Examiners of the State of North Carolina.*

PLESS, J.   G.S. 90-14 provides that the Board of medical Examiners may revoke a physician's license, "when, after due notice and hearing, it shall find [he] . . . has been guilty of . . . any unprofessional or dishonorable conduct unworthy of, and affecting, the practice of his profession . . ." It further provides that its findings and actions shall be subject to review upon appeal to the Superior Court.

G.S. 90-14.10 says that upon the review, the case shall be heard by the judge without a jury, upon the record; that "[t]he court may affirm the decision of the Board or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the accused physician have been prejudiced because the findings or decisions of the Board are in violation of substantive or procedural law, or are not supported by competent, material, and substantial evidence admissible under this article, or are arbitrary or capricious."

G.S. 90-14.11 authorizes any party, including the Board, to appeal to the Supreme Court from the decision of the Superior Court.

The public generally has respect for the learned professions: medical, legal and divinity. If that confidence is to be maintained, it can only be because the ninety-nine per cent of the ethical, honorable members of their professions insist that the one per cent, or less, who violate their responsibilities and duties are promptly shorn of the opportunity to do so. Here, a group of eminent doctors of the very highest character and reputation have (and the record shows they did it reluctantly and regretfully) found their associate guilty, upon impressive evidence, of "lustful, lascivious and unprofessional conduct." The Court found that these findings were supported by the evidence, as was its order that his license to practice medicine be revoked.

However, the Court also found that Dr. Kincheloe did not receive a fair and impartial hearing in that "incompetent evidence outside the scope of his notice was heard and most probably considered by the Board." The finding does not specify this evidence, but upon consideration of the record, we can only construe it as holding improper the questions by the members of the Board regarding the respondent's previous violations, which had resulted in the suspension of his license. This ruling is fallible. (1) The respondent first interjected this feature when he referred to his hearing before the Board three and a half years earlier and said that he was ashamed of the matters then investigated. The admission of incompetent evidence is cured when substantially the same evidence is theretofore or thereafter admitted without objection. 1 Strong, N. C. Index 2d, Appeal and Error, § 48. Thus, if evidence regard-

ing his previous license revocation were incompetent, it had "theretofore been admitted without objection" in the form of respondent's voluntary statement. (2) The proceedings show that the previous charges were already known to the members of the Board so that information given in the present investigation added no new knowledge. (3) Examination of a defendant, or respondent, as to past misconduct is competent for the purpose of impeachment and may properly be considered by a jury (or a board) in weighing the value and credibility of his testimony. Stansbury, in his helpful work, N. C. Evidence, Witnesses, § 42, summarizes the law of cross examination with many citations to support the statement:

> "Cross-examination may be employed to test a witness's credibility in such an infinite variety of ways that an attempt to list them would be futile. 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony . . . and to show his animus, feeling, or bias.' . . . [C]ross-examination is available to establish such well-recognized grounds of impeachment as bad moral character (including specific instances of misconduct), bias, self-contradiction, etc."

2 Strong, N. C. Index, Evidence, § 58, says:

> "The right to cross-examine an opposing witness is a substantial right. The latitude of cross-examination for the purpose of impeachment is wide. A witness may be asked questions on cross-examination which tend to test his accuracy, to show his interest or bias, or impeach his credibility. . . . Questions relating to crime and anti-social conduct are allowed."

The Doctor was questioned about his previous troubles with the Board, as well as other questionable activities, only after he had referred to them, or it was apparent from the questions that the members of the Board already had knowledge of these activities, and no new material information was thus elicited. While no objection was taken at the time, all of the questions asked were competent and would have been admitted by any court.

In its judgment, the Court found that the prosecution of the respondent upon the charge of rape which resulted in his acquittal was not *res judicata* and was not a bar against these proceedings. This was correct, and yet the learned judge implied that questions regarding that trial were improper. We cannot agree. Other factors must be considered. In a criminal trial, the guilt of a defendant must be shown beyond a reasonable doubt; here only a preponder-

ance of the evidence is required. In the criminal charge, the defendant was alleged to have committed rape — here he was charged with unethical and unprofessional conduct in having sexual relations with his patient — a vast difference. In the criminal prosecution, the penalty upon conviction is a death sentence or life imprisonment. In these proceedings, the maximum punishment is the loss of the respondent's license to practice medicine.

It is also implied that some disadvantage resulted to the respondent because he was not represented by counsel at the hearing, saying he could not afford to employ counsel. Also, it must be recalled that he said he didn't think this necessary and that he waived it. Even had he not done so, we know of no provision for the appointment, at public expense, of an attorney for a doctor whose office is so filled with patients that he has to decide whom he will see first. It would strain the credulity of the public to learn that, in these days, there is an indigent doctor!

No material change in the circumstances of the respondent has been shown, but we note that he is now represented by able (and not court-appointed) counsel.

The Court also found that the Board did not comply with G.S. 90-14.6. It is as follows:

> "In proceedings held pursuant to this article the Board shall admit and hear evidence in the same manner and form as prescribed by law for civil actions. A complete record of such evidence shall be made, together with the other proceedings incident to such hearing."

An examination of the lengthy record reveals no violation of this statute by the Board or its attorney. It does demonstrate a rather friendly and sorrowful feeling for the respondent, as in most of the questions he was addressed as "Frank". The only incompetent evidence we find is that the respondent was permitted to violate the hearsay evidence rule and testify to the alleged immoral conduct of Deborah, which he claims was related to him by three different boys.

The respondent admitted he was in the wrong and unfair to the Board in its previous hearing but claims that he did not commit the acts attributed to him here. In the former proceeding, the evidence indicates that the respondent was a deviate, and after the suspension of his license, it had been restored to him with a warning in regard to his future conduct. If he is an uncontrollable deviate, we must all sympathize with him. If he isn't, and his acts here were as the Board found, "lustful and lascivious", the result is the same.

In neither event should he be allowed to practice a profession which affords him the frequent opportunity — if not the temptation — to accede to his deviations or his laschiviousness — whichever it is.

In full and complete hearings, of which the respondent had notice, evidence has been submitted to the Board which fully sustains its findings and order as set out in the statement of facts. No reason appears to question the motives and veracity of Deborah Jean Edwards. If, for any reason, she were making a false charge against the doctor, she could have testified that while in a semi-conscious condition and unable to protect herself, the respondent had sexual relations with her. The fact that she did not so testify but that this was discovered only after she had spoken of her soreness to her sisters, followed by the examination by Dr. Woodall, gives credence to the charges. Upon all of the evidence, including that of the respondent, Deborah was in his office for a sufficient length of time for the incident to occur as found by the Board. Deborah's testimony is corroborated in many details by the testimony of her mother, her sister, Mr. Emerson of the S.B.I., and Dr. Woodall. In opposition to this, we have only the denial of the respondent and rather vague substantiation of part of his statement by the witness Eason.

Upon consideration of all the evidence, we are of the opinion that it was quite sufficient to sustain the findings of the Board and that, as a matter of law, the facts found support its order revoking the license of Dr. Kincheloe. We affirm it in its entirety and also affirm that part of the Judge's order consonate with this ruling.

Upon the appeal of the Board from the order remanding the cause for hearing *de novo,* we are of the opinion, for the reasons set forth above, that the order was not proper, and it is hereby set aside and reversed.

The cause is remanded to the Superior Court of Wake County for judgment revoking the medical license of Dr. Kincheloe in accordance with this opinion.

As to Respondent's appeal — No error.

As to Board's appeal — Reversed and remanded.