IN THE MATTER OF THE REVOCATION OF THE LICENSE OF IRWIN JACOB POLK, M.D., LICENSE NO. 141816 TO PRACTICE MEDICINE AND SURGERY IN THE STATE OF NEW JERSEY.

Argued January 25, 1982—Decided July 30, 1982.

554

556

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for appellant State Board of Medical Examiners (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Erminie L. Conley,* former Assistant Attorney General, of counsel).

*Lewis Cohn* argued the cause for respondent Irwin Jacob Polk, M.D. (*Sills, Beck, Cummis, Radin & Tischman,* attorneys; *Arthur J. Sills,* of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This appeal involves the revocation of a medical doctor's license by the State Board of Medical Examiners for violations of New Jersey statutes regulating the practice of medicine. The primary question presented is whether such violations must be established by clear and convincing evidence rather than by a preponderance of the evidence. The doctor whose license was revoked contends that the use of the lesser burden of proof in medical license revocation proceedings is contrary to the due process and equal protection guarantees of the federal and State Constitutions. Other claims relate to the validity of the statutory standards, the sufficiency of the evidence, the lack of procedural fairness in the manner by which the Board reached its

final determination, and the excessiveness of the ultimate sanction of license revocation.

I

These proceedings commenced with the filing of a seven-count complaint with the State Board of Medical Examiners (Board) against Irwin J. Polk, M.D., a Lincroft allergist, charging him with sexual abuse of five juvenile female patients. The complaint alleged that Polk was guilty of "gross malpractice" under *N.J.S.A.* 45:9–16(h) and *N.J.S.A.* 45:1–21c; repeated acts of malpractice within the meaning of *N.J.S.A.* 45:1–21d; professional misconduct under *N.J.S.A.* 45:1–21e, as well as a lack of good moral character under *N.J.S.A.* 45:9–6; and an inability to act "consistent with the public's health, safety and welfare," as required under *N.J.S.A.* 45:1–21i.

The complaining juveniles testified against Polk at a hearing before a panel designated by the Board. The witnesses were adolescent females who were patients of Polk, in some instances for many years. Although there were individual variations among the stories, they shared a common core of factual allegations. All of the girls testified that, over the period of time covered by the complaints, Polk had embraced and kissed them, attempted to touch their pubic areas, fondled and kissed their breasts and made sexually suggestive remarks. Some of the juveniles testified that they were extremely upset and distraught as a result of these episodes. In one case, the girl's family filed a police complaint against Polk which apparently was not pursued.

The defense case consisted of the testimony of 34 witnesses. Over three days, the Board heard several doctors testify regarding both the need to touch female breasts during stethoscope exams and to palpate the abdomen during checks for ulcers. They further testified as to the heightened sensitivity of adolescent females to inadvertent or innocent touching during physical examinations. Witnesses included three past presidents of the

Monmouth County Medical Society, each of whom testified to Polk's good reputation. Other character witnesses included two State assemblymen, a mayor, two ministers, a rabbi, the editor and publisher of the local newspaper and former patients. Ten present and former members of the doctor's staff testified, as did his office associate. All confirmed his personal style, which included physical gestures of affection for staff, friends and patients alike.

Polk also testified. He denied having behaved improperly toward any of the complaining witnesses or, indeed, toward any of his patients. For example, as to one of the complaining witnesses, C.D., he conceded that he might have patted her on the rear and complimented her on her body, but only as gestures of affection. He also said that he did not deliberately touch her breasts, except as might have been necessary for the stethoscope exam. He defended his actions as those of a physician trying to develop a rapport with a patient who was having a difficult time at home. He also denied trying to kiss any of his patients intimately and that if he had kissed anyone it would have been on the cheek only.

The three-member panel found that the complaining witnesses were credible. With the exception of two witnesses whose stories were not supported by sufficient evidence, the panel believed all of the complaining witnesses and determined that Polk had engaged in the particular acts charged for lascivious, not medical, reasons. It concluded that his conduct was "reprehensible." It further found the acts to have been committed "in a knowing manner" since there was "no evidence of mental or emotional incompetence," although Polk had sought and been granted additional time to prepare a psychiatric defense. It recommended that Polk's medical license be revoked.

Its findings were presented to the full Board of Medical Examiners, which by unanimous vote accepted the report's recommendations, including the penalty of revocation. Polk then filed an appeal. The Appellate Division reversed, holding:

It is our considered conviction that, quite aside from a violation of any constitutional prohibitions, considerations of fundamental fairness alone demand that disciplinary proceedings against physicians (essentially no different in purpose and no less crucial in effect upon the physicians than upon the lawyers) be subject to the clear-and-convincing standard of proof. In each instance, the protection of the public interest is the paramount concern, and "the dire consequences which may flow from an adverse finding" are identical. In short, we are unable to perceive any justifiable basis for the lawyer to receive the advantage of the more favorable standard of quantum of proof in disciplinary proceedings, while denying the benefit of the same standard to the physician similarly situated. [*In Re Polk License Revocation*, 178 *N.J.Super.* 191, 194 (App.Div.1981)]

The Board of Medical Examiners filed a petition for certification which was granted. 87 *N.J.* 398 (1981).

II

The first issue is whether the State Board of Medical Examiners could constitutionally revoke Dr. Polk's license to practice medicine using the preponderance of the evidence burden of proof as opposed to clear and convincing evidence. Polk asserts that due process under the Fourteenth Amendment, as well as under the State's Constitution, requires application of the higher clear and convincing burden of proof.

■ This jurisdiction has long recognized that the usual burden of proof for establishing claims before state agencies in contested administrative adjudications is a fair preponderance of the evidence. In *Atkinson v. Parsekian*, 37 *N.J.* 143, 149 (1962), we observed that: "In proceedings before an administrative agency, . . . it is only necessary to establish the truth of the charges by a preponderance of the believable evidence and not to prove guilt beyond a reasonable doubt." See *In re Suspension or Revoc. License of Kerlin*, 151 *N.J.Super.* 179, 184 n.2 (App.Div.1977) ("Where disciplinary proceedings with respect to a profession or occupation are vested in an administrative agency in the first instance, the charges must be established by a fair preponderance of the believable evidence").

This burden of proof is not found explicitly in any general statute governing proceedings in contested cases before State

administrative agencies, nor is it found in any of the provisions of Title 45, which defines the regulatory authority of the State Board of Medical Examiners and governs the practice of medicine in this jurisdiction. Nevertheless, this particular standard of proof—a preponderance of the evidence—has been consistently applied in agency adjudications for many years.[1] See *Malone v. Fender*, 80 *N.J.* 129 (1979).

Despite this settled practice, Polk contends that application of the preponderance of the evidence burden of proof in the proceedings to revoke his license to practice medicine constitutes a denial of substantive due process.

Several jurisdictions that have expressly considered this issue have held that a preponderance of the evidence burden of proof is adequate to protect the interest involved in professional licensure. *Ferguson v. Hamrick*, 388 *So.*2d 981, 983 (Ala.1980); *Sherman v. Commission on Licensure to Practice the Healing Art*, 407 *A.*2d 595, 601 (D.C.App.1979); *In re Wilkins*, 294 *N.C.* 528, 242 *S.E.*2d 829, 842 (1978). Cf. *Matter of Robson*, 575 *P.*2d 771, 776–77 (Alaska 1978) (holding that due process does not require a higher standard than a preponderance of the evidence for disbarment of an attorney). But see *Fallon v. State Bd. of Medical Examiners*, 441 *P.*2d 322, 326 (Wyo.1968). Other decisions that apply a greater burden of proof suggest that this may be desirable as a matter of legislative policy, but it is not constitutionally mandated. Cf. *Woodby v. INS*, 385 *U.S.* 276, 87

---

[1] In the 1978 amendments to the Administrative Procedure Act (*N.J.S.A.* 52:14B–1, et seq.), creating the Office of Administrative Law, the Legislature provided that hearing examiners are required to report their findings of fact and conclusions of law "... based upon sufficient, competent, and credible evidence ..." *N.J.S.A.* 52:14B–10(c), adopted *L.* 1978, c. 67, § 8. The enactment did not, however, prescribe the particular burden of proof to be applied in agency hearings. Given the long history of the preponderance standard, together with the total lack of any indication in the language of the statute or in its legislative history of an intent to alter that standard, it is reasonable to infer that the Legislature was content to continue "the traditional preponderance-of-the-evidence standard" at the agency hearing level. *Steadman v. SEC*, 450 *U.S.* 91, 102, 101 *S.Ct.* 999, 1008, 67 *L.Ed.*2d 69, 79, reh. den. 451 *U.S.* 933, 101 *S.Ct.* 2008, 68 *L.Ed.* 318 (1981).

*S.Ct.* 483, 17 *L.Ed.2d* 362 (1966) (deportation proceeding); *Nishikawa v. Dulles*, 356 *U.S.* 129, 78 *S.Ct.* 612, 2 *L.Ed.2d* 659 (1958) (naturalization proceedings).

In addressing Polk's constitutional argument, we find the balancing test articulated in *Mathews v. Eldridge*, 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.2d* 18 (1976), to be relevant and instructive.[2] This analytical approach, as applied most recently by the Supreme Court in *Santosky v. Kramer*, —— *U.S.* ——, 102 *S.Ct.* 1388, 71 *L.Ed.2d* 599 (1982), requires an examination and balancing of three factors: (1) the nature of the private interest affected by the proceeding; (2) the countervailing governmental interest to be furthered by the proceeding; and (3) the risk of error in the ultimate determination created by the use of the particular burden of proof. *Santosky*, —— *U.S.* at ——, 102 *S.Ct.* at 1394, 71 *L.Ed.2d* at 607.

Turning first to the private interest involved—the license to practice the profession of medicine—we examine the nature of that interest and the extent of the loss or curtailment threatened by the proceedings. In this jurisdiction, we have long considered an occupational license to be in the nature of a property right, "always subject to reasonable regulation in the public interest." *Jeselsohn Inc. v. Atlantic City*, 70 *N.J.* 238, 242 (1976). *Accord, Lane Distributors Inc. v. Tilton*, 7 *N.J.* 349, 362 (1951); *Kravis v. Hock*, 136 *N.J.L.* 161, 164 (E. & A. 1947). See also *Schireson v. State Board of Medical Examiners*, 130 *N.J.L.*

---

[2]The due process issue addressed in *Mathews* was different from that involved herein. In *Mathews* the Supreme Court held, using a balancing approach, that an evidentiary hearing was not required as a matter of due process before the initial termination of disability benefits. Despite the divergence between the due process claims in *Mathews* and in this case—regarding notice and hearing prior to termination of governmental benefits as opposed to the burden of proof required in a license revocation proceeding—we nevertheless find *Mathews* to be relevant. The core of both claims implicate the same concerns and require delineation of the same concept, namely, that where certain forms of property are at stake, the state is constitutionally required to accord individuals certain protections.

570, 575 (E. & A. 1943) (the license is "a property right . . . derived from the state or society generally, and society is entitled to be protected from practitioners found to be unfit"); *Frazier v. Liberty Mutual Ins. Co.*, 150 *N.J.Super.* 123, 135 (Law Div.1977) (the right to make a living is not a fundamental right).

From a constitutional standpoint, the clear and convincing standard has been found to be required as a matter of due process when the threatened loss resulting from civil proceedings is comparable to the consequences of a criminal proceeding in the sense that it takes away liberty or permanently deprives individuals of interests that are clearly fundamental or significant to personal welfare. Thus, in *Addington v. Texas*, 441 *U.S.* 418, 99 *S.Ct.* 1804, 60 *L.Ed.2d* 323 (1978), relied upon by Polk in this case, the Supreme Court, in upholding the use of the clear and convincing standard in a case involving the potential loss of liberty through civil proceedings, emphasized that "civil commitment for any purpose constitutes a significant deprivation of liberty" and that the "adverse social consequences" engendered by involuntary commitment to a mental hospital "can have a very significant impact on the individual." *Id.* at 425, 99 *S.Ct.* at 1809, 60 *L.Ed.2d* at 330–31. Most recently, the Supreme Court in *Santosky* recognized that an intermediate standard of proof—clear and convincing evidence—is mandated "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money'. . . " *Santosky*, —— *U.S.* at ——, 102 *S.Ct.* at 1396, 71 *L.Ed.2d* at 608, quoting *Addington*, 441 *U.S.* at 424, 99 *S.Ct.* at 1808, 60 *L.Ed.2d* at 330. It noted that the Court "has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.'" *Id.* There the interest of natural parents in the care, custody and management of their child was considered a "fundamental liberty interest," *id.* —— *U.S.* at ——, 102 *S.Ct.* at 1397, 71 *L.Ed.2d* at 610, protected by the

Fourteenth Amendment and subject to the higher burden of proof of clear and convincing evidence.

In contrast, other individual interests not rising to the level of fundamental right are not entitled to protection by a standard of proof greater than a fair preponderance. In *Vance v. Terrazas*, 444 *U.S.* 252, 100 *S.Ct.* 540, 62 *L.Ed.*2d 461, reh. den. 445 *U.S.* 920, 100 *S.Ct.* 1285, 63 *L.Ed.*2d 606 (1980), the Supreme Court recognized that due process requires a higher degree of proof only in cases involving a loss of liberty and that Congress was free to require a lesser burden of proof, such as a preponderance of the evidence, in expatriation proceedings. *Id.* at 266–67, 100 *S.Ct.* at 548, 62 *L.Ed.*2d at 473–72. In *Steadman v. SEC*, 450 *U.S.* 91, 101 *S.Ct.* 999, 67 *L.Ed.*2d 69, reh. den. 451 *U.S.* 933, 101 *S.Ct.* 2008, 68 *L.Ed.*2d 318 (1981), the Supreme Court implicitly and without discussion concluded that there was no fundamental constitutional liberty interest at stake in a proceeding to revoke a license to pursue a profession or occupation, and hence found no due process entitlement to a burden of proof greater than a fair preponderance.

In addition to the nature of the private interest involved, the extent of the loss or impairment of that interest is relevant to the due process inquiry. The permanency of the loss of a substantial private interest is clearly a factor militating in favor of greater protection. *Santosky,* —— *U.S.* at ——, 102 *S.Ct.* at 1397, 71 *L.Ed.*2d at 610. Here, while the proceedings have resulted in license revocation, the revocation under the operative statute apparently is not permanent. Under *N.J.S.A.* 45:9–16, a medical physician whose license has been revoked may apply to the Board for reinstatement at a later date. Furthermore, we recognize that the State Board of Medical Examiners, as a State administrative agency, has a certain range of discretion in meting out sanctions against licensees. Discipline can be imposed which falls short of a permanent loss of licensure.

In sum, under the first *Mathews* factor relating to the nature of the private interest affected and the extent of the threatened

loss, we recognize that the interest is substantial and the potential deprivation great. See *Peper v. Princeton University Board of Trustees*, 77 *N.J.* 55, 77–78 (1978); *Brennan v. United Hatters*, 73 *N.J.L.* 729, 742–43 (E. & A. 1906); *In re Pennica*, 36 *N.J.* 401, 419 (1962). Whether the protection of this significant private interest requires, as a matter of substantive due process, the use of the clear and convincing enhanced standard of proof in State-initiated license disciplinary proceedings, involves a comparative assessment and weighing of the substantiality of that interest with the additional criteria articulated in *Mathews v. Eldridge.*

The next factor to be considered under *Mathews* is the governmental interest to be furthered through the disciplinary proceedings. In this case, that interest is to assure the health and welfare of the people of the State through the regulation and supervision of the licensed medical profession. Government has a paramount obligation to protect the general health of the public. The right of physicians to practice their profession is necessarily subordinate to this governmental interest. *Schireson v. State Bd. of Med. Examiners*, 129 *N.J.L.* 203, 206 (Sup.Ct. 1942), rev'd other grounds, 130 *N.J.L.* 570 (E. & A. 1943). The Legislature "has a deep interest in the regulation of that profession which protects life and health" and clearly has an abiding purpose "to deter and punish physicians who would risk the health and lives of patients through gross malpractice." *In re Suspension of De Marco*, 83 *N.J.* 25, 30 (1980).

The Legislature has also recognized the importance of a medical license and the interest of the physician in retaining his license. The regulatory statute requires, in most instances, that a physician not be found guilty of professional misconduct unless his acts are so particularly egregious as to constitute misconduct in the magnitude of gross malpractice, *N.J.S.A.* 45:9–16(h); *N.J.S.A.* 45:1–21c. See *Kerlin*, 151 *N.J.Super.* at 185–86 (a greater degree of misconduct than applicable in ordinary tort cases is required for discipline). By requiring a showing of

flagrant misconduct, the Legislature has significantly increased the substantive burden which the State must bear in proving that professional dereliction warrants sanction.

Accordingly, we conclude that the State has a substantial interest in the regulation and supervision of those who are licensed to practice medicine. In this capacity, the State acts as the guardian of the health and well-being of its citizens. It must be vigilant and competent to protect these interests fully. Its own obligations in this respect are paramount to the rights of the individual practitioner claiming the privilege to pursue his or her medical profession.

We consider finally whether the use of the preponderance of the evidence standard engenders an intolerable risk of error. Under *Mathews,* this inquiry concerns both the risk that there may be an erroneous deprivation of private interests resulting from use of the preponderance standard, as well as the likelihood that a higher evidentiary standard would effectively eliminate or reduce that risk.

In these proceedings, the factfinding phase is an adversary contest between the State and the licensee. It is a contested administrative case. See *In re Appeal of Uniform Adm. Proced. Rules,* 90 *N.J.* 85 (1982); *N.J.A.C.* 1:1–1.5 to 1.7. The pertinent inquiry is whether, in the course of such proceedings, a preponderance standard fairly allocates the risk of mistake between these two parties and sufficiently reduces for both the risk of an erroneous determination. *Santosky, —— U.S.* at ——, 102 *S.Ct.* at 1394, 71 *L.Ed.*2d at 607.

There are several reasons why the use of the preponderance of the evidence standard in medical license revocation proceedings does not result in an undue risk of incorrect factfinding. As already noted, disciplinary proceedings against medical licensees involve high substantive standards. These include, as a basis for the suspension or revocation of a medical license, insanity, physical or mental incapacity, professional incompetence, habitual use of intoxicants, committing crimes of abortion or moral

turpitude, gross malpractice or neglect in the practice of medicine and endangering the health or lives of persons. *N.J.S.A.* 45:9–16. While these standards are broad, they are capable of objective measurement and application. In light of heightened and strict substantive standards defining professional misconduct, the preponderance of the evidence burden of proof constitutes an appropriate level of certainty to establish guilt. *Cf. Vance v. Terrazas,* 444 *U.S.* at 267, 100 *S.Ct.* at 548, 62 *L.Ed.*2d at 474 (approving congressional choice of the preponderance standard in expatriation cases, noting in particular its correlation with the heightened substantive requirement in such proceedings that it must be shown that the citizen committed an expatriating act with the intent .to renounce citizenship). Hence, any perceived need to counteract or overcome substantive standards that have the potential for subjective, discriminatory, arbitrary or capricious application through a heightened burden of proof are not present under this regulatory scheme.

Furthermore, the licensee is able to defend adequately against the charges. In this case, for example, respondent was represented by outstanding counsel. He used 34 defense witnesses, many of whom were licensed professionals with exceptional qualifications and others who enjoyed fine reputations in their communities and fields of endeavor. In addition, the application of procedural fairness'or due process in the context of administrative adjudication is assured in disciplinary matters before the Board of Medical Examiners. These procedures give a person whose rights are threatened by the proceedings every realistic opportunity to prepare and meet the charges. The framework for the conduct of contested agency cases is designed to provide complete fairness, objectivity and impartiality in the administrative adjudication. See *Unemployed-Employed Council of N. J., Inc. v. Horn,* 85 *N.J.* 646, 650 (1981).

Finally, the subject matter involved in the disciplinary proceeding is such that the risk of confusion, misunderstanding and error is at a minimum. The issues, the evidence and the

standards are thoroughly understood by the parties involved. They relate to a profession, a specialty in which the parties, the witnesses and the members of the tribunals are all uniquely qualified and share a common expertise. Compare *Santosky,* —— *U.S.* at ——, 102 *S.Ct.* at 1399, 71 *L.Ed.*2d at 612–13 (Court stressed disparity between the adversaries' litigation resources and options as factor in its conclusion that use of the preponderance standard in parental termination proceedings engenders an unnecessarily high risk of an erroneous deprivation of private interests). The preponderance of the evidence therefore does not create an unreasonable risk of mistake.

The clear and convincing proof standard is generally used to assist the factfinding tribunal in adjudicating cases that involve circumstances or issues that are so unusual or difficult, that proof by a lower standard will not serve to generate confidence in the ultimate factual determination. See *Addington,* 441 *U.S.* at 423, 99 *S.Ct.* at 1808, 60 *L.Ed.*2d at 329 ("[t]he function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, . . . concern[s] the degree of confidence our society thinks [it] should have in the correctness of factual conclusions"). The heightened burden of proof compensates for the difficulty in marshalling cogent evidence to establish or to defend against a claim. Thus, in some situations the subject matter itself is intrinsically complex and not readily amenable to objective assessment, *e.g., Santosky, supra* (parental unfitness); *Addington, supra* (mental incompetence); *State v. Hurd,* 86 *N.J.* 525, 546–47 (1981) (reliability of hypnotically-refreshed testimony); *Haynes v. First Nat'l State Bk. of N. J.,* 87 *N.J.* 163 (1981) (undue influence upon testatrix); *Sartre v. Pidoto,* 129 *N.J.Super.* 405, 410–12 (App.Div.1974) (paternity). Other cases present claims as to which reliable evidence is not generally available, *e.g., N.J.S.A.* 2A:81–2; *In re Dodge,* 50 *N.J.* 192 (1967) (transactions with decedent or person adjudged incompetent); *Gabel v. Manetto,* 177 *N.J.Super.* 460, 465–66 (App.Div.1981) (oral revocation of express *inter vivos* trust); *Aiello v. Knoll Golf Club,* 64 *N.J.Super.* 156, 161–64

(App.Div.1960) (parol gift of land under circumstances where the grantor was alleged to be estopped from pleading the statute of frauds), or circumstances where most of the relevant evidence is accessible to or in the exclusive control of only one of the parties, *e.g., Haynes, supra.* These situations reasonably call for an allocation and enhancement of the burden of proof to compensate for the difficulties encountered in determining the contested issues.

In this case, on the other hand, neither an intrinsically elusive or esoteric subject matter, nor the absence of reliable evidence, nor the exclusive possession of evidence by one party characterizes administrative disciplinary proceedings against a licensed medical doctor. We are satisfied that the preponderance of the evidence burden of proof is sufficient for purposes of an administrative adjudication concerning professional guilt and discipline against a licensed medical doctor. In view of the subject matter of such proceedings, the nature of the evidence, the qualifications of witnesses, the special expertise of the tribunal, the relative advantages and resources of the parties, and the minimal risk of inaccurate or erroneous factfinding and final decisionmaking, confidence in a final adjudication would not be imperiled by employing the preponderance of the evidence standard. These proceedings do not demand an enhanced burden of proof.

Accordingly, we conclude that the application of the burden of proof by a fair preponderance of the evidence standard in this case did not result in a deprivation of any rights guaranteed to Polk under either the Due Process clause of the Fourteenth Amendment or its counterpart under our State Constitution.

### III

Polk also argues that the application of the preponderance of the evidence standard to medical disciplinary proceedings violates the equal protection guarantees of the federal and State Constitutions because attorney disciplinary proceedings are gov-

erned by the higher clear and convincing standard. He bases his argument principally upon the rationale underlying this Court's adoption of the clear and convincing standard in disbarment or suspension proceedings:

> ... Because of the dire consequences which may flow from an adverse finding ... we regard as necessary to sustain such a finding the production of a greater *quantum* of proof than is ordinarily required in a civil action, *i.e.*, a preponderance of the evidence, but less than that called for to sustain a criminal conviction, *i.e.*, proof of guilt beyond a reasonable doubt. Although the specific rule has not been articulated previously in this State, we declare it to be that discipline or disbarment is warranted only where the evidence of unethical conduct or unfitness to continue in practice against an attorney is clear and convincing. [*In re Pennica*, 36 *N.J.* 401, 419 (1962)]

Polk argues that there are no meaningful differences between attorneys and physicians with respect to the "dire consequences which may flow from an adverse finding" resulting in the loss of the privilege to pursue one's profession. Therefore, he claims that the disparate burdens of proof violate the Fourteenth Amendment's mandate of equal protection, a protection also implicit in Article 1, par. 1 of the New Jersey Constitution.

We are satisfied that no suspect class or fundamental right is involved for equal protection purposes. If either were implicated, then the inequality or difference in treatment would be invalid unless it could be shown that a compelling state interest was at stake and that the disparate treatment was essential to vindicate that compelling state interest. *San Antonio Ind. School Dist. v. Rodriguez*, 411 *U.S.* 1, 17, 93 *S.Ct.* 1278, 1288, 36 *L.Ed.2d* 16, reh. den. 411 *U.S.* 959, 93 *S.Ct.* 1919, 36 *L.Ed.2d* 418 (1973). See *Tomarchio v. Township of Greenwich*, 75 *N.J.* 62, 67 (1977).

A license to practice a profession is not a basic individual right. While it embraces a substantial individual interest which deserves abundant protection, it cannot be equated with a fundamental right, the reasonable regulation of which can be measured and justified only by a compelling state interest. The right to practice medicine itself is granted in the interest of the public and is "always subject to reasonable regulation in the public interest," *Jeselsohn*, 70 *N.J.* at 242.

"Absent infringement of a fundamental right or discrimination against a suspect class, equal protection is not denied if the legislative classification is reasonable and bears a rational relationship to a legitimate governmental objective." *Rubin v. Glaser*, 83 *N.J.* 299, 309 (1980). In this context, it is not enough merely to assert that one group is being treated differently. *Trap Rock Industries, Inc. v. Kohl*, 63 *N.J.* 1, 5 (1973). A state is free to "deal with the different professions according to the needs of the public in relation to each" and "no basis for the charge of an unconstitutional discrimination" is established simply because a regulation affects only one profession. *Semler v. Oregon Bd. of Dental Examiners*, 294 *U.S.* 608, 610–611, 55 *S.Ct.* 570, 571, 79 *L.Ed.* 1086 (1935). *Accord, Kotch v. River Port Pilot Comm'rs.*, 330 *U.S.* 552, 67 *S.Ct.* 910, 91 *L.Ed.* 1093, reh. den. 331 *U.S.* 864, 67 *S.Ct.* 1196, 91 *L.Ed.* 1869 (1947) (A law which affects the activities of some groups differently from the way in which it impacts upon the activities of other groups is not necessarily proscribed by the Fourteenth Amendment).

There are signal differences between the medical and legal professions. Discipline of the legal profession reposes in this Court, not the legislative branch of government. "The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted." *N.J.Const.* (1947), Art. VI, § II, ¶ 3. By allocating and segregating the powers of government, the constitutional framers recognized that the separate branches of government were distinct and independent. *General Assembly v. Byrne*, 90 *N.J.* 376 (1982); *Knight v. Margate*, 86 *N.J.* 374 (1981). They must also have recognized that differences in the exercise and application of these governmental powers would arise.

Polk further asserts that there is no "distinction of constitutional degree between attorneys and physicians as respects the public health, safety or welfare." However, unlike the practice of law, the "daily practice of medicine concerns life and death consequences to members of the public." *In re*

*Kindschi,* 52 *Wash.*2d 8, 319 *P.*2d 824, 826 (1958). See also *In re Suspension of De Marco,* 83 *N.J.* at 30. A less stringent burden of proof in proceedings involving medical licensees than in attorney disbarment proceedings can be viewed as more protective of society's important interest in individual life and health and is therefore not irrational. Furthermore, Polk's argument simply assumes that because a lesser burden of proof is applicable in medical doctors' disciplinary proceedings than in attorneys', the regulatory burdens are invidiously discriminatory or fundamentally unfair. This is not necessarily so.

Attorneys in a real sense function as constituent parts in the overall scheme of the administration of justice. *Middlesex Ethics Comm. v. Garden State Bar Association,* —— *U.S.* ——, 102 *S.Ct.* 2515, 2523, 73 *L.Ed.*2d 116 (U.S., Decided 1982). They are indispensable participants in the justice system; the judicial branch of government could not function effectively without the legal profession. It is for that reason that the legal profession is subject to pervasive regulation.

In the practice of law, virtually every aspect of professional conduct is subject to accountability. Disciplinary jurisdiction covers all facets of professional behavior, including personal financial interest or stake, *DR* 5–101, conflicts, *DR* 5–105, client confidences, *DR* 4–101, incompetence and neglect, *DR* 6–101, appearances of impropriety, *DR* 9–101, speech, *DR* 8–102, advertising, *DR* 2–101, record keeping, *DR* 9–102(B)(3), as well as more serious infractions such as breach of trust, misuse of entrusted funds, and criminal violations, *DR* 1–102 and 9–102. Disbarment of attorneys is permanent, in contrast to the revocation of a medical license which can be subsequently restored.

The disciplinary machinery governing attorney conduct is extensive. It is carefully structured to assure not only fairness to attorneys but protection of the public. Ethics complaints are received, investigated, heard and initially determined by District Ethics Committees. *R.* 1:20–2. Review on a *de novo* basis is provided by the Disciplinary Review Board. *R.* 1:20–3. Dis-

putes involving fees can be resolved by Fee Arbitration Committees. *R.* 1:20A. See *In re LiVolsi,* 85 *N.J.* 576 (1981). All disciplinary matters are subject to review by the Supreme Court. *R.* 1:20–4. In addition, attorneys are subject to the contempt powers of the court. See *In re Yengo,* 84 *N.J.* 111 (1980).

Moreover, the regulatory structure governing attorney's professional conduct provides for the welfare of clients who may have been wronged by a lawyer. The Administrative Office of the Courts can undertake random checks of attorney's financial records, and it can take over an attorney's files, records, accounts and practice in an emergency. *R.* 1:20–5(b). Clients who have been defrauded can seek redress from the Clients' Security Fund, to which all attorneys must contribute. *R.* 1:28.

These factors serve to distinguish the legal and medical professions. In this total framework of comprehensive regulations, it cannot be said that the clear and convincing burden of proof applicable in attorney disciplinary matters confers upon them a special advantage vis-a-vis any other regulated profession. This aspect of the disciplinary scheme does not stand in isolation. It is, in a sense, offset by the strict accountability to which attorneys are otherwise subject. We are therefore satisfied that the detailed and pervasive system for discipline governing the legal profession, including its use of a clear and convincing burden of proof, does not constitute invidious discrimination in comparison with that applied to other professions.

IV

Polk raises several other issues relating to the validity of the license revocation standards, the sufficiency of the evidence and the lack of procedural due process in the ultimate determination. He also questions the amount of the fine assessed against him.

Regarding Polk's claim that the statutory standards are vague, both as written and in their application to his conduct, we considered a virtually identical issue in *In re Suspension of*

*Heller*, 73 *N.J.* 292 (1977). Heller was a pharmacist charged with improperly dispensing codeine-based cough syrup. He attacked his license revocation on the grounds that improperly dispensing drugs was neither expressly proscribed by the Pharmacy Act, nor included in the particularized definitions of "grossly unprofessional conduct." We rejected both arguments, emphasizing that when the task of the regulatory agency " 'is to protect the health and welfare of members of the public' by assuring that all licensed practitioners are qualified, competent and honest, the grant of implied powers is particularly important." *Id.* at 303–04, citation omitted. We also quoted *Bell v. Board of Regents*, 295 *N.Y.* 101, 65 *N.E.2d* 184, 187 (Ct.App. 1946), reh. den., 66 *N.E.2d* 129 (1946), for the proposition that "[i]t has never been necessary for the Legislature . . . to define with particularity acts which would constitute unprofessional conduct;" and further cited *State ex rel. Lentine v. State Bd. of Health*, 334 *Mo.* 220, 65 *S.W.2d* 943, 949 (Sup.Ct.1933), as authority holding that since it would be impracticable for the Legislature to catalogue and specify every act or course of conduct that would constitute such offenses as "bad moral character" and "unprofessional and dishonorable conduct," a doctor's license could also be revoked for having committed a nonspecifically enumerated act of unprofessional conduct. *Heller*, 73 *N.J.* at 300–01.

Polk's challenges are answered by *Heller*. First, he claims that sexual imposition is not "gross malpractice or gross neglect in the practice of medicine which has endangered the health or life of any person" (*N.J.S.A.* 45:9–16(h)) or "gross negligence, gross malpractice or gross incompetence" (*N.J.S.A.* 45:1–21c) because the acts were not related to the actual practice of medicine and there was no evidence that they endangered the lives of his patients. Looking to the statute as a whole, it is beyond belief that sexual abuse of adolescent patients under the guise of treatment could be anything other than gross malpractice. The psychological danger to health was amply demonstrated by testimony of the victims that they were upset,

frightened, shocked and even wary of seeing other doctors, despite health conditions requiring attention. Here, as in *Heller*, the language of the statute cannot have "led him to believe that his conduct was permissible." 73 *N.J.* at 307.

Finally, Polk argues that the concepts of "professional or occupational misconduct," *N.J.S.A.* 45:1–21(e), incapability "for medical or any other good cause, of discharging the functions of a licensee in a manner consistent with the public's health, safety and welfare," *N.J.S.A.* 45:1–21(i), and "good moral character" are unconstitutionally vague. While we did not expressly decide this issue in *Heller*, our reasoning in that case, as well as our citation to cases that did explicitly reach this issue, support the rejection of this claim. See *Heller*, 73 *N.J.* at 300–01 ("The *Lentine* court went on to state that the statutory terms 'bad moral character' and 'unprofessional and dishonorable conduct' were not so vague as to render the statute unconstitutional").

The void for vagueness doctrine incorporates notions of fair notice and warning. *Smith v. Goguen*, 415 *U.S.* 566, 572–73, 94 *S.Ct.* 1242, 1246–47, 39 *L.Ed.2d* 605 (1974). Void for vagueness challenges generally fall into two categories: those wherein the claim is that "no standard of conduct is specified at all," and those wherein the individual asserts that a statute, "by [its] terms or as authoritatively construed appl[ies] without question to certain activities, but whose application to other behavior is uncertain." *Parker v. Levy*, 417 *U.S.* 733, 755–56, 94 *S.Ct.* 2547, 2561, 41 *L.Ed.2d* 439, 457 (1974). It seems clear that Polk's challenge in this case is of the latter variety. *Cf. id.* (noting that a challenge to the military standard of "conduct unbecoming an officer or gentlemen" is an example of the latter type of challenge). In assessing the claim of lack of fair warning or notice, we must be mindful of the fact that those to whom the statute applies—professional doctors—have a peculiar expertise in being able to assess the meanings of these terms. We reject this claim. *Cf. Garden State Comm. Hsp. v. State Bd. of Med.*

*Exam,* 147 *N.J.Super.* 592, 599–600 (App.Div.), certif. den. *sub nom., In the Matter of Garden State Community Hospital,* 74 *N.J.* 283 (1977) (rejecting claim that regulation forbidding performance of "any major surgical procedure except by "a duly qualified surgeon" and "except in matters of dire emergency" was unconstitutionally vague. The Court noted, in particular, that those affected by the rule—physicians, surgeons and hospitals—"undoubtedly" generally understood these terms).

■ Polk's further claim that lack of "good moral character" was not relevant since *N.J.S.A.* 45:9–6 applies only to those who are seeking licensure is also without merit. It is clear that any requirement posed at the outset of licensure can be considered a continuing requirement.

■ Polk's assertions that this evidence was insufficient to establish these charges is also meritless. He was found guilty of sexually imposing himself on three complaining witnesses who were found to be credible and whose version of the events was accepted by the Board. This sort of credibility judgment is unassailable on judicial review and is therefore binding upon this Court. *State v. Johnson,* 42 *N.J.* 146, 159 (1964); *Abeles v. Adams Engineering Co., Inc.,* 35 *N.J.* 411, 423–24 (1961).

■ Polk further assigns as error the fact that the Deputy Attorney General who prosecuted the case also functioned as the Board's legal advisor on unrelated matters. He claims that it necessarily violates due process to have the functions combined in one person. The Board's proceedings were undertaken with full regard to our procedural requirements for fairness in administrative adjudications. All essential procedures designed to assure a proper determination appear to have been satisfied. The record reflects a reasoned determination by both the hearing panel and the Board, based upon an analysis and evaluation of the properly adduced evidence, with sufficient explanation for their conclusions. The antedote to this kind of charge inheres in the exclusivity of the record. There has been no demonstration that the Board was tainted by the attorney

prosecuting the charges or failed to render an independent judgment based upon the evidence before it. See *In re Blum*, 109 *N.J.Super.* 125 (App.Div.1970). As a general rule, a due process violation will be found only when a combination of functions is such as to render independent judgment impossible. *Withrow v. Larkin*, 421 *U.S.* 35, 55–58, 95 *S.Ct.* 1456, 1468–70, 43 *L.Ed.2d* 712, 729–30 (1975). No such impossibility was shown here.

Polk further asserts that the assessment of $2,000 in investigatory costs was improper. He argues first that there was insufficient evidence to find him guilty of the charges, and second, that only one of the accusations involved conduct which took place after the adoption in 1978 of *N.J.S.A.* 45:1–25, the statutory provision authorizing imposition of such costs. Thus, he argues, at a minimum, the costs should be pro-rated.

The claim of evidential insufficiency as to guilt has already been rejected. One of the stated statutory justifications for license revocation is a pattern of conduct including repeated acts of malpractice. *N.J.S.A.* 45:1–21d. Thus, it was entirely appropriate to determine, first, whether the 1978 complaint related to an isolated incident or reflected a pattern of conduct constituting repeated acts of malpractice. Therefore, an investigation triggered by only the last complaint properly extended to earlier similar complaints, disclosing a continuous pattern of professional misbehavior. Since the assessment of statutory costs is properly related to the conduct which is the subject of discipline, no basis for *pro rata* allocation exists.

V

The final issue that we address concerns the appropriateness of the sanction imposed by the Board.

There is no express grant of jurisdiction to the Court to revise an administrative sanction on the grounds of excessiveness. However, the Court has such original jurisdiction as "necessary to the complete determination of any matter on

review." *R.* 2:10–5; *N.J.Const., Art.* 6, § 5, ¶ 3. This grant of power includes the power "to impose a lesser or different penalty in appropriate cases." *Mayflower Securities v. Bureau of Securities,* 64 *N.J.* 85, 93 (1973). *Accord, In re Senior Appeals Examiners,* 60 *N.J.* 356, 368–70 (1972); *West New York v. Bock,* 38 *N.J.* 500, 519–20 (1962).

In exercising this authority to alter a sanction imposed by an administrative agency, the Court can do so only when necessary to bring the agency's action into conformity with its delegated authority. The Court has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency. It can interpose its views only where it is satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority.

It has been stated that the test in reviewing administrative sanctions is "whether such punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" *Pell v. Board of Education, Etc.,* 34 *N.Y.2d* 222, 313 *N.E.2d* 321, 356 *N.Y.S.2d* 833, 841 (1974) (citation omitted). This test was specifically applied in the context of a proceeding to revoke a medical license in *DiMarsico v. Ambach,* 74 *App.Div.2d* 960, 425 *N.Y.S.2d* 894, 895 (1980), in which the court said that unless the penalty shocked the conscience, it was "neither empowered nor inclined to substitute [its] judgment" for that of the Board.

Revocation of a license for sexual abuse has been frequently upheld by courts reviewing determinations of medical licensing boards. See, *e.g., Cardamon v. State Board of Optometric Examiners,* 165 *Colo.* 520, 441 *P.2d* 25, 26 (1968) (*en banc*) (expressly rejecting excessiveness argument as to eye doctor who made a 14-year-old patient strip to the waist on the pretext of examining her breasts for clinical purposes); *In re Kincheloe,* 272 *N.C.* 116, 157 *S.E.2d* 833, 841 (1967), *cert.* denied *sub nom. Kincheloe v. Board of Medical Examiners of North Carolina,* 390 *U.S.* 1024, 88 *S.Ct.* 1414, 20 *L.Ed.2d* 283 (1968) (affirming license

revocation for a doctor who injected a 16-year-old patient with a drug to render her unconscious and then having intercourse with her); *Clark v. Michigan State Bd. of Registration in Medicine,* 367 *Mich.* 343, 116 *N.W.*2d 797 (1962) (license revocation affirmed for indecent advances to a woman in his office). See generally, *Annot.,* "Improper or Immoral Conduct Toward Female Patient as Ground for Disciplinary Measure Against Physician or Dentist," 15 *A.L.R.*3d 1179 (1967). But see, *Ross v. State, Div. of Professions, Etc.,* 342 *So.*2d 1023, 1024 (Fla.App. 1977) (although substantial evidence supported the finding of sexual abuse of a patient, "[w]e are of the opinion that to terminate [the chiropractor's] livelihood after twenty-two years of unblemished service to his profession and patients is unreasonable and excessive").

We have already emphasized the unquestioned importance of a license to practice medicine from the standpoint of society as well as of the individual. *Supra* at 562–566. It is therefore an essential element of the legislatively designed administrative regulatory scheme that the Board, in a disciplinary proceeding, scrupulously consider all factors relevant to continued licensure. It must, furthermore, meticulously weigh the public interest and the need for the continued services of qualified medical doctors against the countervailing concern that society be protected from professional ineptitude.

In this case, the sanction imposed by the Board, license revocation, was well within its statutory discretion. Polk's professional offenses were "reprehensible," to use the Board's own apt characterization. However, as a matter of simple fairness we are constrained to remand the matter to the Board. The record strongly suggests that the Board may have reached a fixed determination as to punishment without giving sufficient consideration to the mitigating circumstances which Polk's coun-

sel sought to present on his behalf.[3]   A remand is therefore appropriate so that the Board can reconsider the sanction to be imposed upon Polk after giving Polk's attorney further opportunity to present information and argument material to the issue of punishment.

Accordingly, the judgment of the court below is modified and the matter is remanded to the State Board of Medical Examiners.   We do not retain jurisdiction.

PASHMAN, J., concurring in part and dissenting in part.

I concur with the majority opinion except insofar as it remands the case to the State Board of Medical Examiners to reconsider the sanction of license revocation.   I would simply reinstate the State Board order of revocation.

The majority opinion recognizes that the test for judicial review of administrative sanctions is whether, under the circumstances of the case, the punishment is so disproportionate to the offense as to shock one's sense of fairness.   *Ante* at 578.   The majority also recognizes that license revocation has frequently been upheld by courts when physicians have been found to have sexually abused their patients.   *Ante* at 578–579.

The State Board of Medical Examiners unanimously recommended the penalty of license revocation.   We should defer to this administrative decision.   I understand the majority's concern for procedural fairness.   I agree that it was wrong for the Board to have determined to revoke Polk's license before hear-

---

[3]Exceptions to the panel's report had been made in writing by Polk's counsel.   He was advised that only comments "in mitigation of the penalty" would be heard at the meeting of the Board.   Before hearing any argument, however, the Board, by unanimous vote, accepted the report's recommendation, including the penalty of revocation.   Thus, counsel was given the chance to make a plea for an alternative penalty, urging consideration of information newly submitted, only after the Board had already imposed the penalty of license revocation.   After a brief response from the State, the Board took a five-minute recess and then reaffirmed its earlier vote to revoke Polk's license.

ing from his attorney. However, the mitigating circumstances would have to be substantial indeed to warrant anything less than license revocation in a case such as this. Polk's attorney did get a chance to urge those circumstances and the Board quickly decided that the new information did not warrant reconsideration of the penalty.

I see absolutely no reason to reverse the Board's determination or to order it to reconsider its decision. The Board heard the relevant evidence and concluded that Dr. Polk had "grossly exploited" his young patients, "denied the reality of their concerns," and "surreptitiously manipulat[ed them] to satisfy his own lascivious interests." Revocation of his license is certainly not shocking under these circumstances. Sexual abuse of one's patients is itself a shocking breach of professional ethics. Because license revocation is not unreasonable, I dissent.

Justice CLIFFORD joins in this dissent.

*For modification and remandment*—Justices SCHREIBER, HANDLER, POLLOCK and O'HERN—4.

*Dissenting in part, concurring in part*—Justices PASHMAN and CLIFFORD—2.