**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0892-22

IN THE MATTER OF
NASHEEDA SINGLETON,
NORTHERN STATE PRISON,
NEW JERSEY DEPARTMENT
OF CORRECTIONS.

Argued September 18, 2024 – Decided October 10, 2024

Before Judges Currier and Marczyk.

On appeal from the New Jersey Civil Service Commission, Docket No. 2021-179.

Michael P. DeRose argued the cause for appellant Nasheeda Singleton (Crivelli, Barbati & DeRose, LLC, attorneys; Michael P. DeRose, on the brief).

Kathryn B. Moynihan, Deputy Attorney General, argued the cause for respondents Northern State Prison and New Jersey Department of Corrections (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Kathryn B. Moynihan, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Paulina R. DeAraujo, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Nasheeda Singleton appeals from the Civil Service Commission's (CSC) October 12, 2022 final administrative action adopting the administrative law judge's (ALJ) initial decision. Based on our review of the record and the applicable legal principles, we affirm.

I.

Petitioner was employed by the New Jersey Department of Corrections (DOC) since 2005. She obtained the rank of sergeant in 2015. In 2016, she was charged with conduct unbecoming of a public employee, N.J.A.C. 4:2-2.3(a)(6). This disciplinary action stemmed from her being charged with driving while intoxicated (DWI), N.J.S.A. 39:4-50; refusal to submit to a chemical breath test, N.J.S.A. 39:4-50.2; driving while intoxicated with a minor in the vehicle, N.J.S.A. 39:4-50.15(b); and second-degree child endangerment, N.J.S.A. 2C:24-4. Petitioner was suspended from 2016 to 2019 as a result of the DWI incident.

Following the disposition of the DWI-related offenses and the child endangerment charge, the DOC entered into a settlement agreement with

2

petitioner in August 2019.[1]   Notably, for the purposes of this appeal, the settlement agreement required—in order for petitioner to be reinstated—that she "successfully complete [the correctional staff training academy] reinstatement process" and any training deemed appropriate by the correctional staff.[2]   The agreement further provided that if petitioner failed to meet these requirements, it would result in a final notice of disciplinary action (FNDA) for removal.

The DOC's Custody Recruitment Unit (CRU) was responsible for vetting and investigating new hires, reinstatements, and rehires.   As part of the reinstatement process, petitioner was subjected to a background investigation.

Lieutenant Anthony Foster was assigned to conduct petitioner's investigation.   Lieutenant Foster's December 2019 report concluded petitioner did not "meet the criteria for employment with the [DOC]."   More particularly, the investigation report revealed three "derogatory" items.   First, petitioner had multiple driver's license suspensions between 2005 and 2016—during her employment—and she failed to disclose this information to the DOC.   Second,

---

[1]   The child endangerment charge was ultimately amended to a fourth-degree crime, and petitioner was accepted into the pretrial intervention program (PTI). The charge was eventually dismissed after she completed PTI.

[2]   The settlement agreement also converted the pending preliminary notices of disciplinary action (PNDA) into a 120-day suspension.

A-0892-22

petitioner discussed the use of prohibited substances and inquired how to circumvent the DOC's drug screening procedures on Facebook. Third, petitioner's social media revealed her child's father, Owens Campbell, wore her DOC uniform shirt in public—an incident she did not report to the DOC. The report stated that petitioner had several photos of Campbell wearing her shirt "that did not represent favorably to the [DOC's] values or to [petitioner's] understanding of [the] standards expected of a sworn law enforcement officer." Accordingly, Lieutenant Foster did not recommend her for employment.

Human Resources forwarded the report to the Special Investigations Division (SID) for further investigation regarding the social media portion of Lieutenant Foster's report. In March 2020, SID issued a report, which was forwarded to the DOC's Office of Recruitment. Petitioner advised the SID investigator that her Facebook account "must have been hacked" by Campbell but "denied previously being aware of or reporting her account being hacked by . . . Campbell." With respect to the photos of Campbell wearing her DOC uniform, petitioner claimed she took the photos for her own protection because she believed she could get in trouble for Campbell wearing the uniform in public. She claimed she did not report the incident to the DOC because she was

4

suspended at the time due to the 2016 DWI incident, and Campbell removed the shirt when she confronted him.

In August 2020, the DOC issued a PNDA charging petitioner with conduct unbecoming a public employee under N.J.A.C. 4A:2-2.3(a)(6). The DOC sought to remove petitioner from her position. Petitioner did not request a departmental hearing. Accordingly, on August 5, 2020, the DOC issued a FNDA sustaining the charges and removing petitioner from employment. She appealed her removal to the CSC, and the case was transmitted to the Office of Administrative Law as a contested case.

An ALJ presided over the two-day hearing. State Correctional Police Officer (SCPO) Lemuel Leeper-Tilghman testified on the DOC's behalf regarding the investigation of petitioner's social media. He discussed the discovery of saved images in petitioner's Google photo account of Campbell wearing her department-issued sergeant's uniform shirt. SCPO Tilghman also testified regarding a search of petitioner's Facebook account, in which petitioner discussed with an acquaintance how to evade a urinalysis test because she "smoked yesterday." He viewed the content as an attempt to circumvent a drug test.

5

SCPO Thomas Januszkiewicz testified he also conducted a review of petitioner's social media accounts. He noted that petitioner stated in one conversation she "smoked a little something earlier in the month" and "was all goofy acting."

Lieutenant Foster testified consistent with his report, finding petitioner failed to meet the DOC's criteria for employment in three areas. First, he determined petitioner failed to properly report several prior criminal charges to the DOC between 1995 and 2007. Petitioner's failure to disclose these charges violated the affidavit of understanding she signed as part of both applications to the DOC. She further failed to report that her license was suspended three times during her employment with the DOC. He noted the DOC requires officers to have a driver's license to transport inmates or other personnel.

Second, Lieutenant Foster found that petitioner's Facebook conversations were inconsistent with department standards. He testified her conversations revealed she had used prohibited substances and tried to circumvent a drug test. As a sergeant with the DOC, petitioner was aware of the drug testing policy and was responsible for ensuring that she and others complied with those policies. Third, Lieutenant Foster testified regarding petitioner's failure to report that Campbell had worn her departmental uniform shirt in public.

6

A-0892-22

Investigator Theodis Ratliff was also involved in the investigation into petitioner's social media. He testified petitioner advised him that she took photos of Campbell using her shirt "for her own protection," but she did not report the incident because she did not believe she was employed by the DOC at the time. With respect to the Facebook conversations involving drug use and circumventing a drug test, petitioner denied knowledge of their existence and claimed Campbell was impersonating her on Facebook. Investigator Ratliff testified, however, that when petitioner provided her social media information to the CRU, she never reported that someone else may have accessed her accounts to impersonate her and engage in communications with her acquaintances.

Petitioner testified Campbell was a drug user and tried to control her. She stated she advised the SID investigator—prior to learning of the derogatory information found on her social media—that Campbell wanted to sabotage her reinstatement process. Because she was forced to move back in with him during her suspension in 2016, Campbell had access to her computer and uniform. Petitioner also claimed she was in a "domestic violence relationship" with Campbell, and she was dependent on him following her DWI and suspension.

A-0892-22

Petitioner testified she did not report Campbell using her uniform shirt because an unidentified Newark police officer, who was present at the time of the incident, told her that because the shirt was neither lost nor stolen, she did not need to report it. She also testified she did not know what her employment status was at the time. However, she acknowledged the settlement agreement indicated the remaining days of her rehire process would be counted as an approved unpaid leave of absence.

The ALJ found the DOC's witnesses were credible, and petitioner's testimony was "less than credible." He determined the DOC proved "by a preponderance of the credible evidence that [petitioner] failed to meet the character and fitness requirements for employment as a correction officer, and that its determination to remove [petitioner] was appropriate." More particularly, the ALJ determined that petitioner's "assertion that Campbell had accessed her Facebook profile and impersonated her in the conversations with [her acquaintances] lacked credibility, as [she] subsequently admitted that she did not know whether Campbell actually accessed her Facebook account and she never attempted to confirm whether he had done so." The ALJ further noted petitioner "had never seen Campbell access any of her social media at any time, and no one ever reported to her that he had." Accordingly, he concluded

8

petitioner's testimony that Campbell had posted the comments on Facebook "appears to be based solely on conjecture, or was otherwise fabricated."

On October 12, 2022, the CSC issued its final administrative action adopting the ALJ's initial decision to terminate petitioner. The CSC determined the exceptions filed by petitioner were "not persuasive" and that "the . . . infractions warrant[ed petitioner's] removal from employment as to find otherwise would be to ignore the agreement of the parties as well as the fact that [petitioner] was found to have committed the identified transgressions."

## II.

Petitioner contends the CSC erred in adopting the findings and conclusions of the ALJ because the ALJ's basis for finding petitioner not credible was inconsistent with the underlying record and failed to consider petitioner's history of abuse at the hands of Campbell. She further asserts the CSC's final decision did not warrant her removal from employment.

Our scope of review of a final administrative action of an agency is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Tr., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). The standard of review applicable to determinations of administrative agencies, including the CSC, is whether there has been "a

9

showing that it was arbitrary, capricious[,] or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies expressed or implicit in the civil service act."  In re Hendrickson, 235 N.J. 145, 160 (2018) (quoting State v. Roth, 95 N.J. 334, 364 (1984)).  The party challenging the final administrative action has the burden of demonstrating grounds for reversal. Lavezzi v. State, 219 N.J. 163, 171 (2014).

On appeal, the judicial role in reviewing an administrative action is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto Grp., Inc., 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

This well-known standard has engrained within it a degree of deference that commands we do not substitute our judgment in place of the agency's merely because we might have come to a different outcome.  See Hendrickson, 235 N.J.

10

at 150. However, "we are 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue . . . .'" Utley v. Bd. of Rev., 194 N.J. 534, 551 (2008) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)). Our review of a "strictly legal issue" is de novo. In re Langan Eng'g. & Env't Servs., Inc., 425 N.J. Super. 577, 581 (App. Div. 2012) (quoting Utley, 194 N.J. at 551).

## A.

Petitioner claims the ALJ failed to consider evidence that Campbell had previously attempted to sabotage her career, which she asserts was disclosed to the investigators before she was confronted with the negative social media information uncovered during the reinstatement investigation. She also contends the ALJ did not consider that Campbell had a history of being abusive toward her in order to keep her "dependent on him." Petitioner further argues the ALJ wrongly determined she was "less than credible" based on her testimony that she had never seen Campbell access her social media. She next asserts that despite the lack of specific evidence that Campbell impersonated her on Facebook, the ALJ ignored her testimony that Campbell had used her phone in the past, pretending to be her, to call and text message certain individuals in an attempt to get information about her.

11

"[T]rial courts' credibility findings . . . are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999). Here, the ALJ determined, and the CSC adopted the finding, that the DOC's witnesses were credible. Moreover, the ALJ found petitioner lacked credibility. As these findings were based on the ALJ's ability to observe the witnesses' demeanor during the hearing, we are in no position to disregard them. See Locurto, 157 N.J. at 474.

As noted, the ALJ determined petitioner's "assertion that Campbell had accessed her Facebook profile and impersonated her in the conversations with [her acquaintances] lacked credibility, as [she] subsequently admitted that she did not know whether Campbell actually accessed her Facebook account and she never attempted to confirm whether he had done so." Moreover, he observed petitioner "had never seen Campbell access any of her social media at any time, and no one ever reported to her that he had." Furthermore, when petitioner turned over her social media information to the CRU, she never reported in advance that someone may have manipulated her conversations. It was only after the CRU conducted its review that petitioner raised this issue. Additionally, petitioner did not provide any corroborating documents or

12

testimony to support her claims that Campbell was out to sabotage her reinstatement or that he had access to her social media accounts.

Petitioner points to other parts of the record that were not specifically addressed by the ALJ. However, the ALJ need not recount and discuss every aspect of each witness's testimony. As stated, the ALJ made certain findings that were supported by references to the record. Petitioner has not demonstrated that the CSC's decision adopting those findings was arbitrary, capricious, or unreasonable. Our role in reviewing the CSC's decision is not to make those credibility calls in the first instance. Rather, we are to determine whether there was sufficient credible evidence in the record to support the findings. Here, there was sufficient credible evidence in the record to support the CSC's findings. Therefore, we conclude the CSC's determination was adequately supported by evidence in the record.

B.

Petitioner next contends the allegations against her were not established by a preponderance of the evidence and otherwise did not warrant her removal. More particularly, petitioner argues the failure to report the incident where Campbell took her uniform shirt and wore it in public did not, in and of itself, justify her removal and further demonstrates the pattern of abuse by Campbell.

13

She asserts it is unclear from the record whether she had an obligation to report the incident, given her "without pay" status at the time the incident occurred.

She further contends the ALJ should not have considered her failure to report a prior offense on her 2002 application because she was not yet employed by the DOC at that time. Moreover, she asserts she disclosed the charges on her reinstatement application. Petitioner also argues that the ALJ should not have considered the older incidents that were allegedly not reported because the DOC was only concerned with the social media transgressions in this matter, given they only asked the SID to investigate those allegations.

We are unpersuaded by petitioner's argument that the allegations did not support her removal and disqualification from full reinstatement. The CSC agreed "with the ALJ that, pursuant to the settlement agreement entered into by . . . [petitioner] and appointing authority, the uncovered infractions warrant removal from employment as to find otherwise would be to ignore the agreement of the parties as well as the fact that [petitioner] was found to have committed the identified transgressions."

We review an agency's disciplinary sanction under a deferential standard and only modify a sanction "when necessary to bring the agency's action into conformity with its delegated authority." In re Herrmann, 192 N.J. 19, 28 (2007)

(quoting In re Polk, 90 N.J. 550, 578 (1982)). A reviewing court "has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency." Ibid. (quoting Polk, 90 N.J. at 578). When reviewing an agency's disciplinary action, we consider "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (quoting Polk, 90 N.J. at 578).

We conclude the punishment here was not so disproportionate in light of the circumstances as to be shocking to our sense of fairness. The ALJ's findings, as adopted by the CSC, that petitioner inquired as to methods to circumvent a drug test and discussed her use of prohibited substances, coupled with her failure to secure her department uniform, and failing to report her license suspensions and prior criminal charges, provided an adequate basis for the CSC's decision. Petitioner's settlement agreement required her to undergo a background investigation regarding her character and fitness. The transgressions uncovered were such that progressive discipline was not appropriate. The CSC's final decision was based on substantial evidence in the record, and the decision to remove her was not arbitrary, capricious, or unreasonable.

A-0892-22

To the extent we have not specifically addressed any of petitioner's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0892-22