706 A.2d 752

IN THE MATTER OF A-1 JERSEY MOVING AND STORAGE, INC.

Superior Court of New Jersey
Appellate Division

Argued January 16, 1998—Decided February 23, 1998.

Before Judges MUIR, Jr., KESTIN and CUFF.

*Scott K. Seelagy*, argued the cause for appellant, A–1 Jersey Moving and Storage, Inc.

*Carmen A. Rodriguez*, Deputy Attorney General, argued the cause for respondent Board of Public Movers and Warehousemen (*Peter Verniero,* Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Rodriguez*, on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

A–1 Jersey Moving and Storage, Inc. (A–1) appeals from a December 12, 1996 order of the Board of Public Movers and Warehousemen (Board) revoking A–1's license to engage in the business of public moving and storage, requiring A–1 to reimburse specified amounts to certain shippers, and imposing a $22,500 fine. The Board's order provided that, after one year, with proof of compliance, A–1 could reapply for its license. A–1's motions for a stay pending appeal were denied, first by the Board and then by us. For the reasons stated herein, we affirm the Board's order.

On December 21, 1994, the Board served A–1 with a letter which charged violations of law, for "engag[ing] in the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense," *N.J.S.A.* 45:14D–7b, and for "repeatedly fail[ing] to discharge contractual obligations to any person contracting for moving or storage services," *N.J.S.A.* 45:14D–7e. The factual specifications alleged that A–1 had "charged [nine named] consumers a premium for transit insurance when in fact you did not have this insurance."

The letter offered A–1 three choices for proceeding:

- avoid[ing] the initiation of formal disciplinary proceedings by signing [an acknowledgement of the allegations] and paying a civil penalty in the amount of $25,000; [or]

- waiv[ing your] right to a hearing and submit[ting] a written statement or explanation to the Board. The Board will then consider this statement and render a final decision; [or]

- request[ing] a hearing in which case the matter will be scheduled, and this notice will serve as a complaint. At the hearing you may, either personally or with the assistance of an attorney, submit such testimony or other evidence as you may deem necessary in order for the Board to finally determine whether the unlawful acts set forth herein have been proven.

The letter went on to state:

You should also be aware that upon final evaluation of the evidence submitted at the hearing, the Board may, if unlawful acts are found to exist, assess civil penalties in an amount greater than that herein offered in settlement. Additionally, the Board may, if the facts are found to so warrant, enter an order requiring the restoration of any monies acquired by unlawful acts, the payment of costs and directing that you cease and desist from continued use of those acts found to be unlawful.

A-1's president, Matthew DiBattista, Jr., chose the second option offered in the Board's letter. He returned a signed certification form dated December 27, 1994, in which he "waive[d] any right ... to a hearing in this matter" and noted the "submi[ssion of] a written statement for the Board's final consideration[.]" Notwithstanding the latter indication, the record contains no separate statement by DiBattista or otherwise on A-1's behalf. A handwritten entry at the bottom of the certification notes: "copy of change of policy." In its subsequent final decision and order entered on February 13, 1996, the Board stated:

[A-1] elected to submit a written explanation consisting of only a copy of an unsigned "Request for Change" form addressed to [its] insurance company. The form indicated that [A-1's] policy period began September 14, 1993 and ended September 14, 1994.

The Board went on to note that at the time of its inspection, A-1's spokesman

maintained that he was not required to send any premium monies collected from shippers to his insurance broker, Ross and Company, Inc., of Fairfield, New Jersey. Respondent stated that a flat rate of payment for insurance was mutually agreed upon by Respondent and Ross and Company. In addition, Respondent stated that it was permitted to keep any monies collected from shippers for transit insurance.

The decision continued:

At its meeting on January 17, 1995, the Board considered Respondent's explanation and the investigators [sic] certified report. The Board accepted Respondent's representation that it was not required to forward the money collected in transit insurance premiums to Respondent's insurance company. However, the Board

accepted the representation by Respondent's insurance company that Respondent's policy was canceled for failure to pay the total premium due effective April 5, 1994 and was not reinstated. The Board found that Respondent failed to conform with statutory and regulatory obligations ... and thus it concluded that the violations occurred. However, upon review by the Board it was determined that the assessment of the maximum civil penalty of $2,500 for each violation against the nine separate consumers had actually been calculated based on ten consumers, therefore, the civil penalty was reduced accordingly.

Based on the foregoing findings and conclusions, A–1 was ordered to pay a total civil penalty of $22,500 within ten days; to refund all insurance premiums collected to each of the nine shippers within fifteen days, and provide proof of repayment within twenty days; and to "cease and desist from engaging in any of the conduct found herein to be unlawful."

After the final decision and order was entered, DiBattista inquired of the Board concerning the basis of the charges. A March 19, 1996 letter from the Board responded to DiBattista's request for information, enclosing pertinent documents, complying with his request even though "the Board is under no mandate to do so, neither are we mandated to keep you informed of your insurance cancellations." A letter from DiBattista, misdated December 28, 1994, acknowledged receipt of the documents, raised some questions, and closed with: "Again, I wish to point out that at no time was A–1 Jersey aware of any cancellation. Please review this information, and advise of your findings."

Having received no indication of A–1's compliance with its February 13, 1996 order, the Board, on September 3, 1996, issued and served an order to show cause, returnable October 8, 1996, requiring A–1 to establish why its license should not be suspended or revoked for failure to comply with the February 13, 1996 order, and why additional sanctions including further assessment of civil penalties or costs should not be imposed. A–1 was represented by counsel on the rescheduled return date, October 15, 1996.

A–1's non–compliance with the terms of the February 13 order was not in issue on the return of the order to show cause. In the face of DiBattista's contention that he had only received the first and third pages of the three-page order of February 13, 1996, an

evidentiary hearing was held on the issue of service. The Board's Executive Director, Diane Romano, relying on a Postal Service return receipt, testified that the order as mailed had been received on behalf of the addressee, A–1. Romano also testified that she had no reason to believe that an incomplete order had been sent. She noted that DiBattista's subsequent inquiry not only contained references to matter on the allegedly missing page but also omitted to mention a missing page. DiBattista testified that he had not received page two of the order.

■ Following the hearing, the Board, in its December 12, 1996 final decision and order, found that A–1 and DiBattista had received the three-page order of February 13, were aware of its contents, and had not complied with its terms. These findings are supported by substantial credible evidence and are, therefore, entitled to deference. *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 588, 538 *A.*2d 794 (1988); *Close v. Kordulak Bros.,* 44 *N.J.* 589, 598–99, 210 *A.*2d 753 (1965).

■ In addition to its fact-based challenge on the service issue, A–1 contends on appeal that the Board lacked the authority to revoke A–1's license based upon A–1's failure to comply with the February 13 order. The argument is that the expressed statutory bases upon which the Board may revoke, suspend, or refuse to renew or issue a license do not include non-compliance with a final decision and order of the Board. A–1 concedes that the charges initially propounded by the Board evoked types of misconduct set out in *N.J.S.A.* 45:14D–7 as grounds for license suspension or revocation. Nevertheless, A–1 argues, that because the statutory provision does not specifically enumerate non-compliance with a Board order as a ground for license suspension or revocation, when the Board elected in its initial proceeding to impose sanctions short of license suspension or revocation, it could not thereafter move against the license after the licensee failed to discharge its ordered obligations.

We reject the position advanced as doubly self-defeating. It disserves the interests of licensees, as the Board would be discour-

aged from imposing lesser sanctions than suspension or revocation in appropriate circumstances because of the possibility that the licensee might be non-compliant and the Board thereafter precluded from moving against the license. The argument also disserves the public interest, for, without any risk of ultimate sanction, licensees would be encouraged to flout the requirements of well-grounded Board orders.

We also regard the argument as flawed because it negates the well-established rule that an administrative agency's authority includes "those incidental powers which are reasonably necessary or appropriate to effectuate" the powers expressly granted. *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978) (quoting *In re Regulation F-22, Office of Milk Industry,* 32 *N.J.* 258, 261, 160 *A.*2d 627 (1960)). The operative principle governing this case is self-evident: a licensing body with disciplinary authority and the power to impose sanctions which include license revocation must be seen to have the inherent authority, with appropriate procedural safeguards, to revoke a license for the licensee's failure to comply with lesser sanctions. *See In re Suspension of Heller,* 73 *N.J.* 292, 303, 374 *A.*2d 1191 (1977); *In re Valley Road Sewerage Co.,* 295 *N.J.Super.* 278, 287–88, 685 *A.*2d 11 (App.Div.1996), *certif. granted,* 151 *N.J.* 71, 697 *A.*2d 544 (1997).

We reject, as well, A–1's argument that the procedure established in *R.* 4:67–6, Summary Proceedings to Enforce Agency Orders, provides the exclusive mechanism for enforcing final agency orders, thereby precluding the Board's action in moving against A–1's license in the face of A–1's failure to comply with the terms of the February 13, 1996 order. The summary proceedings referred to in *R.* 4:67–6 are plainly designed to provide judicial remedies in aid of agency orders where necessary. *See* Pressler, *Current N.J. Court Rules,* comment on *R.* 4:67–6 (1997); *cf. In re Valley Road Sewerage Co., supra,* 295 *N.J.Super.* at 290–92, 685 *A.*2d 11. They were never intended to supplant other jurisdictional exercises by State agencies; nor could they have been so

purposed without intruding on the authority of the Legislature to grant each agency its express and implied powers.

A–1 also contends that it was denied due process of law in the administrative procedures employed, especially insofar as those procedures resulted in the imposition of monetary penalties and license revocation. As a matter of fundamental fairness, a licensee must be afforded notice and an effective opportunity to be heard whenever a licensing body proposes to act in a way that would impinge upon a property right or a liberty interest. *In re Polk,* 90 *N.J.* 550, 562–63, 449 *A.*2d 7 (1982). Clearly, A–1 was so entitled, both when the Board proposed to impose civil penalties and other sanctions for charged infractions, and later when it proposed to move directly against the license by reason of A–1's failure to comply with the earlier order. It is equally clear that, in both proceedings, A–1 was accorded every bit of the process to which it was due. When the initial charges were advanced, A–1 was fully advised and given three procedural choices, ranging from an admission to a full hearing requiring that the factual and legal premises of the charges be proven and formally established. Through its president, A–1 chose a middle course. Having done so and having made a submission of its choosing, A–1 could not thereafter appropriately challenge the adequately established factual bases upon which the findings of violation were predicated. The time for challenge was before the determination, not after.

Once the February 13, 1996 decision and order was issued, it became A–1's duty, in the absence of valid grounds for appeal, to comply with its terms. With no compliance apparent, A–1 was given an appropriate procedural opportunity to show cause why further action should not be taken. This, too, was not an occasion to go behind the earlier decision and order; rather, it furnished a necessarily limited opportunity for A–1 either: to demonstrate that it had complied with the essential terms of the order, or to establish some adequate basis for excusing the obligation, or to persuade the Board that it was entitled to additional time for compliance. A–1 failed to make any such showing.

A–1 argues further that use of an order to show cause as the means for bringing the compliance issue before the Board was invalid because it lacked a basis in a rule or regulation validly promulgated in accordance with the standards of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 to –15, particularly *N.J.S.A.* 52:14B–4. This argument lacks merit. The order to show cause mechanism is manifestly not within the range of subjects referred to in *N.J.S.A.* 52:14B–2(e), which defines "administrative rule" by describing the qualities which characterize such enactments. The order to show cause is indisputably not an "agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization ... of any agency." *Ibid.* It is, rather, a well-established means—with historical provenance, *see* Wright and Miller, *Federal Practice and Procedure* § 1195 (1990)—for bringing a matter expeditiously to the attention of a tribunal, whether that tribunal be an administrative agency, *see N.J.A.C.* 1:1–9.2, or a court, *see generally, R.* 1:6–2. *See also, e.g., R.* 1:10–2 (as to summary contempt proceedings); *R.* 4:52–1 (as to injunctions); *R.* 4:56–1 (as to actions to approve a plan of bank reorganization); *R.* 4:60–14 (as to claims regarding property subject to attachment or sequestration); *R.* 4:67–2 (as to summary actions generally); *R.* 4:69–3 (as to actions in lieu of prerogative writs); *R.* 4:87–1 (as to actions for the settlement of accounts); *R.* 4:93–1 (as to declarations of death); *R.* 5:12–2 (as to proceedings by the Division of Youth and Family Services). If a rule promulgation complying with the standards of the Administrative Procedure Act were necessary to validate the order to show cause mechanism in administrative agencies because it "describes the ... procedure or practice requirements of any agency," *N.J.S.A.* 52:14B–2, then *N.J.A.C.* 1:1–9.2, a provision of the Uniform Administrative Procedure Rules, *see N.J.S.A.* 52:14F–5e, f, and g, would suffice as the required basis.

The December 12, 1996 final decision and order of the Board is affirmed.