**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4042-21

IN THE MATTER OF KODI
POLLOCK, SOUTH WOODS
STATE PRISON, DEPARTMENT
OF CORRECTIONS.

_____

Submitted January 16, 2024 – Decided January 31, 2024

Before Judges Marczyk and Vinci.

On appeal from the New Jersey Civil Service Commission, Docket No. 2022-909.

Jacobs and Barbone, PA, attorneys for appellant Kodi Pollock (Louis Michael Barbone, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Department of Corrections, South Woods State Prison (Donna Sue Arons, Assistant Attorney General, of counsel; Kevin K.O. Sangster, Deputy Attorney General, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Levi Malcom Klinger-Christiansen, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Kodi Pollock appeals from the July 20, 2022 final administrative action of the Civil Service Commission which upheld her removal from the position of senior corrections police officer with the New Jersey Department of Corrections ("DOC").  Having considered the record and applicable legal standards, we affirm.

We discern the following facts from the record.  In 2016, Pollock was hired by the DOC and assigned to South Woods State Prison in housing units H1-2L and H1-2R.  Elijah Blanton is a former inmate who was assigned to housing unit H1-2R where he served as "head runner" until his release on August 29, 2020.[1]  Pollock was Blanton's housing unit officer and supervised Blanton.

In March 2021, the Special Investigations Division ("SID") of the DOC began an investigation after receiving information from two confidential informants that Pollock passed messages from Blanton, with whom she allegedly was engaged in an unduly familiar relationship, to Blanton's former cellmate, who was a current inmate.  Surveillance video confirmed Pollock met with Blanton's former cellmate as reported by the confidential informants.

---

[1]  Based on the record, the "head runner" is an inmate assigned to work in the housing unit cleaning and completing any other tasks assigned to the inmate by corrections officers.

A-4042-21

Pursuant to communications information orders, the SID obtained call detail records for mobile phone numbers associated with Pollock and Blanton, which revealed approximately 249 phone calls between the two. The calls began as early as September 12, 2020, two weeks after Blanton was released from South Woods and the first day Blanton's mobile number was active. Pollock and Blanton spoke twice on September 12, 2020, for a total of one hour and forty-two minutes. The SID obtained search warrants for the mobile phones and seized the phones. Pursuant to communications data warrants, the SID extracted approximately 10,180 text messages between Pollock and Blanton from the phones.

On March 22, 2021, while Pollock was on duty as the housing unit officer, the SID searched areas of housing unit H1-2R that were under Pollock's supervision and discovered various contraband items. Her jacket contained food items, vehicle keys, and other items from outside the facility. A locked cabinet for which Pollock was responsible during her shift contained a small plastic bag of the controlled dangerous substance ("CDS") Buprenorphine (Suboxone), beard trimmers, and inmate-manufactured immersion heaters. Pollock assumed control of the only keys to the locked cabinet at the beginning of her shift and

A-4042-21

was in possession of the keys at the time of the search. Two more immersion heaters were discovered in the housing unit officer's podium bundled in a sock.

The text messages evidenced a personal and business relationship between Pollock and Blanton. In a text exchange on September 22, 2020, they wrote:

> [Blanton]: I think ou[r] chemistry is sublime girl[. I] told [yo]u long ago [yo]u have my heart and I meant that[.] I just want you to b[e] totally comfy with me . . . [I] truly [honestly] think [you are] amazing from head to toe and everything in between. And [I']m not just talking about our business ventures [I] want [to] keep [going] with every aspect of our relationship[.] [H]ow about [you?]
>
> [Pollock]: [O]h okay that[']s awesome. [A]nd heck yes I want to continue with both and do everything. [Y]ou know [I']m down with you.

The text messages included photographs taken by Pollock of her in various states of undress along with graphic descriptions of sexual acts Pollock and Blanton intended to perform on each other. Other text messages were sent by Pollock while she was at work, evidencing her use of her mobile phone while on duty. In one such exchange they wrote:

> [Blanton]: I love u sooo much kodi rose send me a pic [right now] pl[ea]s[e] and thank [yo]u[.]
>
> [Pollock]: [A]t work eating Chinese [with photograph Pollock took of herself in uniform eating.]

4

[Blanton]:  [G]et it.  I f[*******] love it [you're] the best[.]  [L]ove [yo]u sweetness how do [yo]u still have [yo]ur phone[?]

[Pollock]:  I brought it in lmao[.]

In another text message exchange, Pollock disclosed to Blanton an incident in which an officer was assaulted by an inmate while sitting at his desk and wrote, "people are getting hurt because inmates are stupid and with this new detention it[']s like better for inmates and they want to go."  Blanton then encouraged her to leave her job and Pollock responded, "that's why [I] wan[t to] get a move on with this stuff we wan[t to] do."

The SID conducted a recorded interview of Pollock.  A summary of the interview is included in the SID's administrative investigation report.[2]  Pollock initially denied any relationship with any current or former inmate but told the investigators she received a call unexpectedly from a former inmate who was assigned to her housing unit and wanted a construction job with her father.  Pollock recalled the inmate was one of her main runners for at least one year and was able to describe him but denied knowing his name.  Pollock denied giving the inmate her phone number and did not know how the inmate was aware

---

[2]  The parties did not include the recording in the appellate record.  Instead, they cite to the administrative investigation report.

of her father's business.  Pollock said she spoke with the inmate a couple of times but did not believe they spoke more than ten times.  Pollock maintained she was only acting as a conduit between the inmate and her father.

After the investigators confronted Pollock with evidence of 249 phone conversations between her and Blanton, Pollock recalled the inmate's nickname was "E" but repeatedly continued to deny she knew his name.  Pollock also recalled discussing his children and that he lived somewhere in Trenton.  Pollock denied any romantic relationship with "E" and denied the two ever met.  Pollock did recall giving "E" her address but did not know why she did that and did not remember if she ever asked him to meet her.  Pollock continued to deny she knew his name.

When questioned about the frequency of her text messaging with Blanton Pollock was not able to estimate the number of times they communicated.  Pollock told the investigator's she stored his number under the name "Alene" which she believed was his wife's name.  After being confronted with evidence of over 10,000 text messages between her and Blanton, Pollock admitted she sent him photographs of her in her bra and underwear and recalled graphic exchanges in which they discussed performing sexual acts on each other.

A-4042-21

Pollock, however, denied ever engaging in a sexual relationship with Blanton and insisted she was merely flirting.

Pollock denied the contraband found in the locked cabinet was hers, but admitted she concealed food items in the lining of her jacket to evade detection when entering the prison. Pollock acknowledged she and Blanton were or intended to engage in business ventures together including a bounce house business for profit. She also acknowledged she provided Blanton with information so Blanton could send her money to help pay her bills.

As the interview progressed, Pollock admitted she and Blanton "talked on the phone a lot . . . maybe a couple of hours here and there . . . throughout the day." Pollock admitted her initial statement that she and Blanton talked a couple of times was false, and claimed she initially provided untruthful responses because she was embarrassed. Pollock admitted she was not honest with the investigators, particularly about her inability to recall Blanton's name. When asked if her statement was accurate and truthful, Pollock responded, "[a]t first no[,] but then yes." Pollock contended that she did not believe it was inappropriate for her to have contact with Blanton because he completed his maximum sentence and was a "free man."

A-4042-21

Pollock was previously suspended for thirty days for other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12), specifically, violation of administrative procedures and/or regulations involving safety and security, Human Resources Bulletin ("HRB") 84-17: D-7.  That prior incident involved undue familiarity with inmates when Pollock secreted "herself in the laundry room, with the door closed and lights out, with two inmates . . . ."  Pollock was aware of the DOC policy on staff/inmate over familiarity from that incident as well as her training.

Pollock was served with a preliminary notice of disciplinary action charging her with: conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12); selling or possession of alcoholic beverages or CDS while on State property and/or on duty, HRB 84-17: C-2; falsification: intentional misstatement of material fact in connection with work, employment application, attendance, or in any record, report, investigation or other proceeding, HRB 84-17: C-8; divulging confidential information without proper authority, HRB 84-17: C-10; conduct unbecoming a public employee, HRB 84-17: C-11; use possession or sale of any CDS (custody), HRB 84-17: C-13; improper or unauthorized contact with inmate – undue familiarity with inmates, parolees, their families, or friends, HRB 84-17: D-4; violation of administrative procedures and/or regulations involving safety

and security, HRB 84-17: D-7; and violation of a rule, regulation, policy, procedure, order, or administrative action, HRB 84-17: E-1.

After Pollock waived her right to a departmental hearing, the DOC issued a final notice of disciplinary action sustaining the charges and removing Pollock from her position. Pollock filed an appeal with the Commission, and the matter was transferred to the Office of Administrative Law. The DOC moved for summary decision. In a comprehensive written opinion dated June 23, 2022, the administrative law judge ("ALJ") granted the DOC's motion for summary decision, ordered that all the charges against Pollock were sustained, and affirmed the penalty of removal.

The ALJ found, based on Pollock's admissions during the SID interview and the other evidence presented, the DOC proved by a preponderance of the evidence Pollock engaged in conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6), and constituting other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12). Specifically, the ALJ found Pollock engaged in an unduly familiar relationship with Blanton within one year of his release from custody, intentionally made false statements in connection with the SID investigation, possessed contraband in the prison, and divulged confidential information to

Blanton. On July 20, 2022, the Commission issued its final administrative action accepting and adopting the ALJ's findings.

On appeal, Pollock argues there were material facts in dispute and summary decision in the DOC's favor was improperly granted. She argues she did not knowingly violate the DOC's staff/inmate over familiarity policy because she believed the policy applied only to former inmates on community release or parole status or some other form of criminal justice jurisdiction, and the ALJ effectively determined Pollock was not credible by granting summary decision. Pollock also contends the ALJ erred by finding she was in possession of the Suboxone found in the locked cabinet despite her claim she did not know it was there. She urges us to exercise a de novo review of the record.

Pollock does not address any of the other violations, including that she intentionally made false statements in connection with the SID investigation,[3] divulged confidential information to Blanton, and possessed contraband other

---

[3] Pollock implies in her statement of facts she did not make false statements during the investigation. A passing reference to an issue is not sufficient to properly raise an issue on appeal. Miller v. Reis, 189 N.J. Super. 437, 441 (App. Div. 1983) (holding issue not briefed beyond conclusory statements need not be addressed). The contention is also without merit because Pollock admitted she misrepresented material facts during the SID investigation.

than the Suboxone in the prison. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

Our review of a final agency decision is limited, and we "do not ordinarily overturn such a decision 'in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence.'" In re Carter, 191 N.J. 474, 482 (2007) (citations omitted). Further, we may not substitute our judgment for that of the agency's when "substantial credible evidence supports [the] agency's conclusion . . . ." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992) (citations omitted). Instead, we "defer to an agency's expertise and superior knowledge of a particular field." Ibid.

A summary decision "may be rendered if the papers and discovery which have been filed, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to prevail as a matter of law." N.J.A.C. 1:1-12.5(b). This standard is similar to the rule governing a motion for summary judgment. See R. 4:46-2(c).

"Conduct unbecoming a public employee," N.J.A.C. 4A:2-2.3(a)(6), is an "elastic" phrase encompassing "any conduct which adversely affects . . . morale or efficiency . . . [or] which has a tendency to destroy public respect for [public] employees and confidence in the operation of [public] services." Karins v. Atl.

11

City, 152 N.J. 532, 554 (1998) (first alteration in original) (quoting In re Appeal of Emmons, 63 N.J. 136, 140 (1960)). Conduct that "has the tendency to destroy public respect for [public] employees and public confidence in the operation of" the public entity is intolerable. Id. at 557.

Pollock's status as a corrections police officer subjects her to a higher standard of conduct than ordinary public employees. In re Phillips, 117 N.J. 567, 576-77 (1990). This is because corrections police officers represent "law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public." Carter, 191 N.J. at 485-86 (quoting Twp. of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965)).

It is undisputed Pollock engaged in an unduly familiar relationship with a former inmate within weeks of his release, provided false information to the SID investigators, possessed contraband in the prison, and provided sensitive information regarding prison operations—all in violation of the applicable rules, regulations, and procedures. These violations are plainly sufficient to support the Commission's determination that Pollock engaged in conduct unbecoming a public employee.

A-4042-21

Pollock's contention that the ALJ was required to conduct an evidentiary hearing to determine whether she knowingly violated the DOC's staff/inmate over familiarity policy is not persuasive. Pollock concedes she violated that policy but asserts, without citation to any authority, a knowing violation is qualitatively more serious than an unknowing violation. Even accepting that contention as valid, the ALJ properly granted summary disposition. Pollock's violation of the policy was properly considered in conjunction with the many other serious violations at issue in this case and her prior disciplinary history. Under the facts of this case, whether she violated the policy knowingly or unknowingly was not material to the ultimate level of discipline imposed.

Pollock's claim that the ALJ improperly determined she violated the policy prohibiting possession of CDS in the prison without a hearing is likewise not convincing. Pollock was responsible for the locked cabinet where the Suboxone was found and was in possession of the only keys to the cabinet at the time of the search. Pollock's contention that she did not put it there is not material. A CDS was discovered in an area under her control in violation of the prohibition on contraband in the prison. There was no need for a hearing to determine whether Pollock was the person who put it there.

Pollock does not challenge the level of discipline imposed. Even if she did, we would not disturb the Commission's determination. "A reviewing court should alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated authority.'" In re Herrmann, 192 N.J. 19, 28 (2007) (quoting In re Polk, 90 N.J. 550, 578 (1982)). In reviewing administrative sanctions, "the test . . . is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (quoting Polk, 90 N.J. at 578). The sanction of removal in this case does not shock one's sense of fairness considering the numerous serious violations at issue and Pollock's prior disciplinary history.

The Commission's decision is supported by sufficient, credible evidence on the record as a whole. R. 2:11-3(e)(1)(D). To the extent we have not otherwise addressed petitioner's arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1) (E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

14

A-4042-21