**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1343-23

IN THE MATTER OF ROBERT
MCCAULEY, SOUTHERN
STATE CORRECTIONAL
FACILITY, DEPARTMENT
OF CORRECTIONS.

_____

Submitted June 3, 2025 – Decided July 11, 2025

Before Judges Smith and Vanek.

On appeal from the New Jersey Civil Service Commission, Docket No. 2021-1452.

Chance & McCann, LLC, attorneys for appellant Robert McCauley (Kevin P. McCann, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Southern State Correctional Facility (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Gary W. Baldwin, II, Deputy Attorney General, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Erin Gilgen, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Robert McCauley, a Senior Correctional Police Officer, appeals the Civil Service Commission's November 22, 2023 final decision upholding his termination due to a positive drug test. He argues: that his positive test resulted from over-the-counter allergy medication rather than illegal drug use; that chain of custody violations denied him due process; and that the New Jersey Department of Corrections should have used progressive discipline. After reviewing the record and controlling law, we affirm.

## I.

Robert McCauley worked as a Senior Correctional Police Officer at the New Jersey Department of Corrections' Southern State Correctional Facility ("DOC"). On September 25, 2020, the Department selected McCauley to perform a random drug test requiring two samples. Before giving his urine samples, McCauley reviewed a drug screening policy manual with SID Investigator Jesse Akers. The manual included instructions and attachments, including a confidential form where McCauley could provide information about prescription and non-prescription medications he had used within the fourteen days prior to testing. The manual included a form which McCauley acknowledged and signed. It stated:

> I understand that I must provide two urine samples, which will be forwarded to the NJ State Toxicology

Laboratory (NJSTL). In the event I wish to challenge the results of the test, I or my legal representative must immediately notify the Department of Corrections and the NJSTL of my intentions to challenge the results, or frozen samples may be destroyed in accordance with NJSTL procedures.

McCauley signed the manual and completed the medication form, which staff then removed from the booklet and placed into a sealed envelope that accompanied the two samples. The New Jersey State Toxicology Laboratory ("the lab") received and accepted the samples. The lab tested McCauley's first sample using a two-stage procedure.[1] McCauley's test results indicated a presumptive positive for amphetamine and methamphetamine. The first sample was tested again and confirmed. The lab kept the second sample frozen. Neither party disputes that McCauley never requested testing of his second sample.

Akers received the toxicology report from the lab, including the confirmed positive results for methamphetamine and amphetamine, on October 29, 2020. McCauley completed a medical authorization to release his medical records. The purpose of this was to confirm whether any medications he had taken could

---

[1] The first stage, known as screening, is conducted to detect the possible presence of drugs; if no positive results are found, laboratory testing concludes at this stage. If a presumptive positive result emerges during screening, the process proceeds to the second stage, called confirmation. At this stage, the laboratory uses gas chromatography/mass spectrometry ("GCMS") testing to verify the presence and concentration of the drug detected.

A-1343-23

trigger a positive drug test result. Akers then interviewed McCauley on December 9, 2020. During the interview, McCauley supplied Akers with information about his healthcare providers and pharmacy to verify the medications and prescriptions he had listed on his medication form. McCauley's providers reported that they had not prescribed medications which would result in a positive urine test for methamphetamine or amphetamine.

Because of the positive test, the DOC issued a preliminary Notice of Disciplinary Action to McCauley on November 11, 2020. The DOC charged McCauley with: conduct unbecoming a public employee under N.J.A.C. 4A:2-2.3(a)(6); other sufficient cause under N.J.A.C. 4A:2-2.3(a)(12); Human Resources Bulletin (HRB) 84-17, C-11, conduct unbecoming a public employee; HRB 84-17, C-30, use, possession, or sale of any controlled dangerous substance (custody); HRB 84-17, D-7, violation of administrative procedures and/or regulations involving safety and security, and HRB 84-17, E-1, violation of a rule, regulation, policy, procedure, order, or administrative decision.

At the disciplinary hearing, the DOC proffered, among other things: the positive test result from the lab; a medical report indicating McCauley's urine contained controlled substances amphetamine and methamphetamine that McCauley had not listed on his submitted medication form; and documentation

showing there were no prescribed or non-prescription medications in McCauley's records that could cause this result.

The DOC issued a final notice of disciplinary action sustaining all charges and removing McCauley from his position on March 25. McCauley appealed to the Civil Service Commission, and a hearing took place before the Office of Administrative Law.

An administrative law judge ("ALJ") conducted hearings over two days, December 7, 2022, and June 26, 2023. The Department presented four witnesses: Jesse Akers, Michael Ryan, George Jackson, Ph.D., and Andrew Falzon, M.D. McCauley testified on his own behalf, and Dawn McCauley, McCauley's wife, also testified. During the hearing, Dr. Jackson, Executive Director of the New Jersey State Toxicology Laboratory and qualified expert in forensic toxicology, testified that McCauley's sample tested more than 388 times higher than the laboratory's cutoff level for methamphetamine. Falzon, the chief New Jersey State Medical Examiner and qualified expert in forensic pathology, testified that the only way a positive drug test result for methamphetamine would occur is if the individual consumed methamphetamine. McCauley testified that he didn't list all his medications on the confidential medication form because he was embarrassed by the medications he was taking, and thought other people

could view his form. He admitted he did not complete his medication form accurately.

On October 23, 2023, the ALJ issued an initial decision sustaining all charges against McCauley, except for the violation of the Department's safety and security charge. The ALJ found McCauley's disciplinary history significant, but it determined that progressive discipline did not need to be considered because McCauley violated the Department's zero-tolerance policy and the ALJ found McCauley's misconduct egregious. The ALJ found no discrepancy in the chain of custody records and determined the testing was analytically sound. The ALJ further found that neither Dawn nor McCauley offered a credible explanation for the positive drug results. The ALJ upheld McCauley's termination. On November 22, 2023, the Commission issued a final administrative decision ("FAD") adopting the ALJ's initial decision.

McCauley appealed.

## II.

Our scope of review of an agency's decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). "We defer to an agency decision and do not reverse unless it is arbitrary, capricious[,] or unreasonable or not supported by substantial credible evidence in the record." Jenkins v. N.J. Dep't of Corr., 412

N.J. Super. 243, 259 (App. Div. 2010). But our review is not "perfunctory[,]" nor is "our function . . . merely [to] rubberstamp an agency decision." Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 191 (App. Div. 2010). Instead, "our function is 'to engage in a careful and principled consideration of the agency record and findings.'" Ibid. (quoting Williams v. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)).

In determining whether an agency's action is arbitrary, capricious, or unreasonable, we consider in part "whether the record contains substantial evidence to support the findings on which the agency based its action." Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n., 234 N.J. 150, 157 (2018) (quoting Stallworth, 208 N.J. at 194). "'Substantial evidence' means 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Figueroa 414 N.J. Super. at 192 (quoting In re Pub. Serv. Elec. & Gas Co., 35 N.J. 358, 376 (1961)).

We must defer even if we would have reached a different result. In re Carter, 191 N.J. 474, 483 (2007) (citing Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). It is not our role to second-guess or substitute our judgment for that of the agency and, therefore, we do not "'engage in an independent assessment of the evidence as if [we] were the court of first

instance.'" In re Taylor, 158 N.J. 644, 656 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "While we must defer to the agency's expertise, we need not surrender to it." N.J. Chapter of Nat'l Ass'n of Indus. and Office Parks v. N.J. Dep't of Envt'l Prot., 241 N.J. Super. 145, 165 (App. Div. 1990). An appellate court does not automatically accept an agency's interpretation of a statute or a regulation, and reviews strictly legal questions de novo. See Bowser v. Bd. of Trs., Police & Firemen's Ret. Sys., 455 N.J. Super. 165, 170-71 (App. Div. 2018).

We review an agency's disciplinary sanction under a similar deferential standard and only modify a sanction "when necessary to bring the agency's action into conformity with its delegated authority." In re Herrmann, 192 N.J. 19, 28 (2007) (quoting In re Polk, 90 N.J. 550, 578 (1982)). A reviewing court "'has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency.'" Ibid. (quoting Polk, 90 N.J. at 578). When reviewing an agency's disciplinary action, we consider "'whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" Id. at 28-29 (quoting Polk, 90 N.J. at 578).

III.

A.

McCauley argues his positive test results occurred because he consumed an over-the-counter allergy medicine.  McCauley emphasizes that he suffered from memory issues and was unable to remember what medications he took during the two-week period before the test.  We are not persuaded.

There was substantial evidence to support the Commission's final agency decision.  The Commission found Falzon's expert opinion credible and determined that there was nothing in McCauley's pharmacy records which could account for his methamphetamine and amphetamine drug test results.  Falzon testified that if Sudafed did cause a false positive, then the confirmation phase would have identified it, but it did not.  Falzon also testified he did not see or review anything in McCauley's test results that would create a false positive and could not be confirmed in the confirmation screening.  Finally, Falzon testified the only way a donor can test positive for methamphetamine is by ingesting it and not by other medications, prescriptions, or combination thereof.

The Commission accepted McCauley's testimony that he regularly used over-the-counter medications for allergies.  That said, they found nothing in the record which would equate his use of allergy medication with a positive urine

drug test for methamphetamine and amphetamine. The Commission ultimately found that McCauley offered no explanation to account for his positive drug test.

There was sufficient credible evidence in the record, including testimony from experts and doctors, establishing that McCauley tested positive for the two drugs and that over-the-counter medication was not the cause of his positive test. Under our deferential standard of review, we discern no error.

B.

McCauley next argues that the Department's final decision violated his procedural due process rights by improperly releasing his second urine sample before he could have it tested, breaking the chain of custody for his urine samples. We disagree.

When McCauley provided his urine samples, he provided a signed statement which stated:

> I understand that I must provide two urine samples, which will be forwarded to the NJ State Toxicology Laboratory (NJSTL). In the event I wish to challenge the results of the test, I or my legal representative must immediately notify the Department of Corrections and the NJSTL of my intentions to challenge the results, or frozen samples may be destroyed in accordance with NJSTL procedures.

Section IV, subsection B(6)(b) of the DOC HRB 99-01, amended November 6, 2009, entitled Specimen Acquisition Procedures, states, "[t]he Department shall maintain possession of the second specimen for a period of [sixty] days or until the agency receives notification from the State Toxicology Laboratory that the first specimen tested negative for the presence of controlled substances."

DOC guidelines clearly require retention of the second sample for at least sixty days regardless of immediate request. However, it remains undisputed that McCauley never requested testing of his second sample by an independent laboratory, either immediately or after the sixty-day period. Because he never attempted to exercise this right, the Commission properly concluded that the DOC's premature disposal of the sample did not provide a basis to challenge the chain of custody of the second sample or, ultimately, amount to a denial of his due process rights. We conclude there was no error.

## C.

Finally, McCauley argues the Commission's FAD was arbitrary and capricious because it could have chosen to implement progressive discipline and imposed a lesser punishment, noting he has never tested positive in a drug test before. We are unconvinced.

11

Correctional police officers are sworn law enforcement officers and are held to a higher standard of conduct than other public employees. See N.J.S.A. 2A:154-4. A law enforcement officer is "a special kind of public employee" who must present an image of "personal integrity and dependability in order to have the respect of the public." In re Philips, 117 N.J. 567, 576 (1990) (internal quotation marks omitted). Discipline of a law enforcement officer need not be "predicated upon the violation of any particular rule or regulation but may be based merely upon the violation of the implicit standard of good behavior which devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct." Hartmann v. Police Dep't of Ridgewood, 258 N.J. Super. 32, 40 (App. Div. 1992) (internal quotation marks omitted).

Since 2001, the Attorney General has issued a "Law Enforcement Drug Testing Policy." The Policy governs random drug testing of law enforcement officers under the legal authority of the Attorney General and the penalty for officers who test positive. Corrections officers are subject to the Attorney General's Policy. N.J.S.A. 52:17B-97 to -117.

Under the Attorney General's Law Enforcement Drug Testing Policy, it states in pertinent part,

> When a sworn law enforcement officer tests positive for illegal drug use . . . [t]he officer shall be

administratively charged and, upon final disciplinary action, terminated from employment as a law enforcement officer . . . . The officer shall be permanently barred from future law enforcement employment in New Jersey.

[Off. of the Att'y Gen., Attorney General's Law Enforcement Drug Testing Policy 12 (rev. Apr. 2018).]

Progressive discipline should be considered when appropriate. In re Hermann, 192 N.J. at 29. However, the concept is "not subject to universal application." Id. 36. Some offenses are so egregious in nature that removal is appropriate regardless of the employee's prior disciplinary history. An agency can disregard progressive discipline "when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Id. at 33.

We can modify a penalty imposed by an agency if it concludes that the decision to impose the penalty was arbitrary, capricious or unreasonable, but should do so only "when necessary to bring the agency's action into conformity with its delegated authority." Id. at 28 (quoting Polk, 90 N.J. at 578). A reviewing court should alter the penalty only where "such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 28-29 (quoting Polk, 90 N.J. at 578).

A-1343-23

Under the Attorney General's Drug Testing Policy, termination is required upon a finding of illegal drug use. Here, the Commission found that McCauley tested positive for amphetamine and methamphetamine, and there was no reasonable explanation for this result other than his consumption of illegal drugs. Under the Attorney General's policy, the only disciplinary action that could be imposed on McCauley was termination. Removal was appropriate, and the Commission's decision was not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1343-23